Isaac Tyson *vs.* Thomas B. Watts.—*December* 1848.

An agreement set forth, "that *B* had on his farm, copper and other minerals, and is desirous to have the same properly explored and worked"—that "*P* is willing to undertake such exploration and working." *W,* "in consideration of one dollar paid to him by *P,* agrees to give *P* the power to make such exploration and works, as *P* may think proper for such purposes, and reduction and conversion of the minerals, and dispose of the same;" that *W* reserves to himself *one-fifteenth* part of all such minerals and metals, after the same shall have been rendered fit for smelting, free and clear of all expenses; that *P* shall commence on or before, &c. HELD, upon a bill filed by the assignee of *P,* for specific execution of the contract, that *P* was only bound to *explore* the mines, not to *work* them, and that he only stipulated to explore them on or before a given day, and therefore specific execution, for want of mutuality in the contract, could not be decreed.

APPEAL from the Court of Chancery.

The bill in this case was filed on the 24th June 1846, by the appellant against the appellee.

The bill alleged, that on the 8th July 1844, *Thomas B. Watts* entered into a written agreement with *Thomas Petherick,* of the State of *Pennsylvania,* which, after reciting that *Watts* had on his farm at *Bare Hills,* in *Baltimore* county,

*Maryland*, copper and other minerals, which he was desirous to have *explored and worked*, and that *Thomas Petherick* was willing to undertake such exploration and working, declared, that *T. B. W.*, for, &c., in consideration of one dollar paid to him by *T. P.*, agreed to give to *T. P.*, his heirs and assigns, full power to make such explorations and works on the said farm as he, *T. P.*, might think proper for such purposes, and for the reduction and conversion of the minerals, and to carry away and dispose of the minerals or metals, subject to the following conditions, viz :

"That there should be reserved to *Watts*, his heirs or assigns, a seignorage of one full fifteenth part or share of all such minerals or metals, after the same should have been rendered fit for smelting, reduction or use, free and clear from all expenses whatsoever." "That *T. P.*, his heirs or assigns, should, on or before the 10th July 1845, commence proper explorations, for the purpose of ascertaining the mineral prospects on the said farm. That if the seignorage should be found to be less than the average rate of seignorage, or dues paid to the land owners on the ores raised in the great copper mining district of *Cornwall*, in *England*, such seignorage should be increased to such average rates, to be determined by the arbitration of two respectable and competent persons, (one to be chosen by each party,) after they should have made satisfactory enquiries on the subject. That on the 18th June 1845, *T. B. W.* agreed with *T. P.*, by agreement in writing of that date, to make the proper explorations, for the purpose of ascertaining the mineral prospects on said farm, as provided in the agreement first aforesaid, and within the time therein limited for commencing such explorations, for which *T. P.* was to pay to *Watts* thirty dollars; fifteen of which were paid at the time. That the explorations were made according to a plan furnished by *T. P.*, and were completed by said *Watts* about the 24th July 1845, when he was paid fifteen dollars, which, with ten dollars paid to him on the 16th July, made forty dollars, which he received for his work, besides four dollars and seventy-one cents, paid to him for, &c., connected with said work; that at the time of making the foregoing agreement, *T. P.* believed

that *Watts* was the owner in fee of the property mentioned therein, and called his farm at *Bare Hills;* and believed also that the property was unincumbered, and that *Watts* had good right to enter into the agreement first aforesaid, and authority to carry out the same; but, in point of fact, as *P.* afterwards discovered, *Watts* was entitled, when he made said agreement, to the *reversion only* of the said property, after the life estate of his mother, *Lydia Watts,* then living thereon, and that his reversionary interest, even, was incumbered by a mortgage, which, &c., to secure, &c. That *T. P.,* although disappointed in his expectations about the said mining privileges, in consequence of his misunderstanding of *Watts'* title, was nevertheless willing to take from *Watts* such title as he was able to give, even though the enjoyment of the privileges agreed to be conveyed to him, would be thereby postponed until after the decease of the tenant for life. That on the 22nd December 1845, *T. P.* assigned in writing all his interest in the mining privileges, acquired under the contract aforesaid, to complainant; that complainant purchased from *T. P.,* in good faith, looking forward to the enjoyment of the said privileges after the decease of the tenant for life, and that he accordingly demanded from *Watts* a conveyance of the said mining privileges, agreed to be by him, *Watts,* conveyed to *T. P.,* according to the extent of his, *Watts',* interest therein; but *Watts* has hitherto refused to make the said conveyance, and affects to treat as a nullity his agreement with *T. P.* Prayer, for specific performance, and for general relief.

The complainant filed, with his bill, the several contracts and agreements therein referred to, and which, with the answer, are sufficiently stated in the arguments of counsel and opinions of the chancellor, and of this court, *post.*

At March term 1847, the chancellor, (Johnson,) delivered the following opinion :

The bill is for the specific performance of an agreement between the defendant, *Thomas B. Watts,* and *Thomas Petherick,* bearing date the 8th July 1844. It recites, that *" Watts* has on his farm at *Bare Hills,* in *Baltimore* county,

in *Maryland*, copper and other minerals, which he desires to have properly explored and worked; and that *Petherick*, residing at *Philadelphia*, in *Pennsylvania*, is willing to undertake such exploration and working; and then, in consideration of one dollar paid to him, *Watts*, by *Petherick*, he, *Watts*, his heirs and assigns, agreed to give *Petherick*, his heirs and assigns, full power to make such explorations and works on the said farm, as he, *Petherick*, may think proper for such purposes, and for the reduction or conversion of the minerals, and to carry away and dispose of the minerals or metals, subject to the following conditions, viz :

"That the said *Watts* reserves to himself, his heirs or assigns, a seignorage of one full fifteenth part or share of all such minerals or metals, after the same shall have been rendered fit for smelting, reduction or use, free and clear of all expenses whatever. That said *Petherick*, his heirs or assigns, shall, on or before the 10th July next, commence proper explorations, for the purpose of ascertaining the mineral prospects on the said farm; that if the seignorage above reserved, be found to be less than the average rate of seignorage, or dues paid to the land owners on the ores raised in the great copper mining district of *Cornwall*, in *England*, such seignorage, above reserved, shall be increased to such average rate, to be determined by arbitration," &c.

There is then a provision, that *Petherick* should give references as to his respectability, prior to this contract, as it appears by the date of the paper, to wit, on the 18th of the preceding month of June, the defendant had agreed, for the sum of $30, to make for *Petherick* an excavation to the shaft sunk on the copper ore on the farm, which sum, with some small additional sums, were shown to have been paid, and it appeared by a paper, under the hand and seal of *Petherick*, dated on the 22nd of December 1844, but acknowledged on the 22nd of December 1845, that he had disposed of his interest under the agreement with the defendant to the plaintiff. The transfer thus signed, sealed and acknowledged by *Petherick*, and which is written upon the same paper upon which the agreement is written, is in these words: "I hereby acknowledge to have

disposed to *Isaac Tyson, Jr.*, of *Baltimore*, my right and interest under the annexed agreement.   *Pottsville, Pennsylvania*, December 22nd, 1844."

The bill, which seeks the specific execution of this agreement, the rights under which are thus supposed to have become vested in the complainant, alleges, that *Petherick*, at the time of making the agreement, believed that *Watts* was the owner of an unincumbered fee-simple-interest in the property mentioned therein, and had a perfect right to make and carry out the contract; but that he afterwards discovered that he was entitled only to the reversion, after life-estate of his mother, then and still living, and that his reversionary interest was incumbered by a mortgage for a considerable sum of money.   That *Petherick*, nevertheless, notwithstanding his disappointment in regard to the title of *Watts*, was willing to take from him such title as he was able to give, though the enjoyment of the mining privilege would be thereby postponed until after the decease of the tenant for life.   That the complainant purchased from *Petherick*, in good faith, looking forward to the same period for the enjoyment of said privilege, and that he accordingly demanded from *Watts* a conveyance of the privilege of mining, to the extent of his interest in the property, but that *Watts* refuses to make any conveyance whatever, affecting to treat the agreement as a nullity.

The defendant, in his answer, and in the agreement made by his counsel, rests the relief prayed by this bill upon several grounds :

1st.   That all title to a decree for the specific performance of the agreement, has been forfeited by the laches of *Petherick*, in not commencing mining operations so soon, as by the contract he was required to do, no such operations having been begun at the present time.

2nd.   That *Petherick* is now, and always had been, an unnaturalized foreigner, never having resided in *Maryland*, and for that reason, incompetent to receive, or transfer to the complainant a title to the lands, or the mining privilege aforesaid.

3rd.   That prior to the alleged transfer to the complainant, *Petherick* had surrendered and abandoned to the defendant

whatever rights he acquired under the contract; and that the defendant, on his part, released *Petherick* from all claims and demands he might have had against him in respect thereof; and that this was known to the complainant at the time he took the said alleged transfer.

4th. That the contract, as now expounded by the complainant, is inequitable and unjust, destitute of mutuality and fairness, and as wanting in those qualities which should induce a court of chancery in the proper exercise of that discretion, which the rules and principles, applicable to such cases, give the court over the subject, to decree a specific performance.

An agreement was entered into by the parties, by which a number of letters were admitted in evidence, to have the same effect as if proved under a commission; and it was also admitted, in the same way, that *Petherick is not a citizen of the United States, and that he never resided in the State of Maryland.*

The chancellor does not consider it necessary to refer particularly to these letters, as, in his opinion, the case must turn upon grounds having no connexion with their contents, and upon which they can shed little or no light.

This, as has been remarked, is a bill for the specific performance of an agreement; and is therefore an application to the sound discretion of the court, which withholds or grants relief, according to the circumstances of each particular case, as it presents itself. The discretion, it is true, is not arbitrary and capricious, but sound and reasonable, adapting itself, and being governed, as far as practicable, by general rules and principles,— when those rules and principles are not in conflict with the justice of the case between the parties. There would seem to be no doubt, that when a court of chancery is called upon to exert its extraordinary jurisdiction, in compelling the specific performance of contracts, though it is not entirely exempt from those general principles of equity, which have been found, by experience, best and most surely to advance the aims and ends of justice, there is, nevertheless, more freedom in its action, than when exercising its ordinary powers. *St. John vs. Benedict,* 6 *John's Ch. R.,* 111. *Seymour vs. Dulancey, Ib.,* 223. *Geiger, et al., vs. Green,* 5 *Gill Rep.,* 472. "Unless the court is

v.7

satisfied, says *Chancellor Kent*, that the contract is fair and just, and equal in all its parts, and, founded on an adequate consideration, it will not, by the interposition of its extraordinary power, order it to be executed," and this seems to be the established doctrine upon the subject.

If an agreement is deficient in either fairness, justice, or certainty, its specific execution will not be decreed, and hence a stronger case is required on the part of a plaintiff asking a decree, for the specific performance of a contract, than is required of him who resists such decree.   2 *Story Eq.*, sec. 769, 770.

And, in addition to the elements of fairness, justice, and certainty, the agreement must be *mutual*, before the power of the court, to order its specific performance, can be successfully invoked, and, indeed, it may be well doubted, whether a contract can be considered, in any respect, fair and just, if it be not mutual.   "I have no conception, (says *Lord Redesdale*, in 1 *Sch. & Lef.*, 18,) that a court of equity will decree a specific performance, except where both parties had, by the agreement, a right to compel a specific performance, according to the advantage which they might be supposed to have derived from it."

The Court of Appeals, in the case referred to, of *Geiger, et al., vs. Green*, 5 *Gill*, 472, say, "it is established, that unless there is to be found in the contract the essential ingredient of *mutuality*, a court of equity will not compel its specific execution," and in that case, the bill was dismissed, because of the absence of that indispensable ingredient.

The contract upon which the bill in this case is filed, and the specific performance of which it seeks to enforce, contemplated, not only the exploration, *but the working* of the mines of copper and other minerals, on the farm of the defendant. It recites the desire of the defendant to have them explored and worked, and the willingness of the said *Thomas Petherick* to undertake such explorations and working, and then, in consideration of one dollar paid to the defendant by *Petherick*, the former agreed to give to the latter, his heirs and assigns, full power to make such explorations and works on the said farm as he, the said *Petherick*, might think proper for such purpose,

&c.; and after a reservation to the defendant of a seignorage, of one full fifteenth part of the minerals, *Petherick*, for himself, his heirs and assigns, stipulated that he would, on or before the 10th *July* next, commence proper operations for ascertaining, by explorations, the mineral prospects on the said farm.

Although, therefore, it was the manifest design and object of the defendant to have the minerals upon his farm worked, as well as explored, and although, for a small pecuniary consideration, he gave *Petherick* full power to such explorations and works, the only stipulation on the part of *Petherick* is, by a certain period, "to commence operations, for ascertaining, by explorations, the mineral prospects on the said farm." The engagement, therefore, on the part of *Petherick* was limited to the exploration; and he was not bound, according to my interpretation of the contract, to work the mines; whilst, therefore, the contract gives to him the power to work the mines, as he might think proper, the only corresponding obligation on his part was to explore, for the purpose of ascertaining the mineral wealth of the farm. There can be no doubt, I think, that the defendant never would have entered into this contract, if he had believed that the working of the mines was not secured by it, and that whether they should be worked or not, depended upon the discretion of the party with whom he was contracting. The contract, therefore, it seems to me, is deficient in that reciprocity of obligation, without which a court of equity will not decree a specific performance. It appears to me difficult to maintain, that the defendant could have obtained a decree against *Petherick* for the specific execution of this contract to the extent, which he clearly had in view in entering into it; that is, to compel *Petherick* to work, as well as to explore, the minerals, even though the title of the defendant, to the farm, had been entirely unincumbered; and, if this is the case, that is, if there is a want of mutuality in the remedies, as well as the rights of the parties to the contract, it would be inequitable, as said by *Lord Redesdale*, in 1 *Sh. & Lef.*, 18, to decree a specific performance at the suit of him who is not bound, as, if the rule were different, he might en-

force, or avoid the contract, according as his interest might incline him, the one way or the other. It is much better in such cases of inequality of obligation, to refuse a specific performance, and leave the plaintiff to seek his compensation, if he has sustained damage, by an action at law; because, if equity acts at all, it must, as *Chancellor Kent* says, in 6 *J. C.,* 232, "act *ex vigore,* and carry the contract into execution with unmitigated severity."

The contract, in this case, though varying, of course, in terms, and, in some respects, perhaps in substance, from the contract in the case of *Geiger vs. Green,* decided by the Court of Appeals; yet, in other and in some very essential particulars, it very much resembles that case. In that case, the contract gave the complainant the privilege of digging and removing ore from the farm of the defendant, at twenty-five cents per ton for the privilege of the ground; leave also to build a house on said land, the workmanship to cost $100, the material to be got on the land of defendant, at the expense of the plaintiff.

This contract, the Court of Appeals say, is unequal in its stipulations, binding one party and not the other, and consequently unreasonable, and unfit to be carried into specific execution.

It seems to the chancellor, that so far as regards the chief inducement to the contract, on the part of the defendant in this case, to wit, the working and making the deposites of mineral profitable to him, it is precisely like the contract in *Geiger and Green,* because here, as in that case, the power to work the minerals is a privilege to *Petherick,* which he may or may not exercise, in his discretion; and, consequently, this contract, like that, is binding on one party, and not the other, and unfit, for that reason, to be executed.

This bill, however, was not filed by *Petherick,* but by his assignee; a party with whom the defendant made no contract at all, one who has entered into no stipulations with him, of any description, and who, although he has purchased the interest of *Petherick* in the agreement, has entered into no engagement to perform such stipulations, as the contract may be supposed to have imposed upon *Petherick.*

The chancellor thinks it would be difficult to maintain, successfully, that upon a bill filed by the defendant against this plaintiff, the latter could be compelled to perform those acts, which it was clearly the intention of the defendant to secure, when he made this contract; and, if so, the want of the element of mutuality, as between these parties, is supposed to be fatal to the right of the present plaintiff to a decree for a specific performance.

It being the opinion of the court, for the reasons stated, that the plaintiff is not entitled to relief, and that the bill must be dismissed, it is not thought necessary or proper to examine the other questions raised in the argument, and by the pleadings, and therefore no opinion is expressed upon them. It may, however, not be improper to say, that there does not, in the confusion and discrepancies, which have been pointed out and commented upon in the statement of the chancellor, appear to be any ground for attributing unfair or dishonorable motives to the plaintiff.

The explanation which has been given in regard to these discrepancies, seems to me entirely to relieve the complainant from any such imputation.

Whilst, however, the court abstains from expressing an opinion with regard to the effect upon this case, which the circumstance of *Petherick's* being an alien may be supposed to have, or upon the question of his alleged laches or abandonment of the contract, as evidenced by the correspondence, it is deemed not out of place to remark, that the uncertainty of the provisions of the instrument which is sought to be enforced, would present a serious objection, if the other difficulties were removed. If this contract is to be enforced as against the defendant, the plaintiff should surely be required to perform the agreement on his part; but what can he be required to do, and when no time is fixed for working the mines; that this is referred to his own discretion, and cannot be commenced until after the determination of the life estate of the mother of the defendant, she being still living. Upon the whole, the chancellor thinks, the want of the mutuality, the uncertainty, and the difficulty of enforcing this agreement consistingly with

those principles of equity, by which the court must be governed in the exertion of its powers, forbid the relief asked for by this bill, and that it must, consequently, be dismissed.

The complainant in chancery appealed to this court.

The cause was argued before SPENCE, MARTIN, and FRICK, J.

By J. H. B. LATROBE and REVERDY JOHNSON for the appellant.

On the 24th June 1846, the appellant filed a bill in *Baltimore* county court, sitting in equity—subsequently removed to chancery—for the specific performance of an agreement, between the appellee and one *Thomas Petherick,* under whom the appellant claims. The bill sets out the terms of the agreement.

There was no oral testimony taken under the commission issued in the cause, which is therefore to be determined upon the bill and answer, the two agreements, the receipts, the assignment to *Tyson,* and the correspondence.

The answer sets up as a defence, certain conversations between *Petherick* and himself, before the execution of the contract, but the conclusive reply to so much of the above as relates to *Petherick's* promises, antecedent to the agreement, is the agreement itself; to which, all that took place between the parties beforehand, was mere inducement; and beyond which we are not permitted to look, to ascertain their meaning.

The remaining grounds, on which the claim for a specific performance is resisted, are but two :

1ST. That *Petherick,* as an alien foreigner, "was not competent, at law, to receive a deed for the lands or for the mines;" or "to pass or transfer any right to the complainant."

2ND. That, even if this ground was not tenable, *Petherick,* before the transfer to the appellant, "actually surrendered, abandoned, and gave up, all his supposed rights acquired under the said agreement;" and the appellee "had released" him "from all claims and demands" under it. It is true, that fraud is charged upon the appellant, but this is not proved.

The first of these grounds involves a question of law, in regard to the extent of an alien's power, in the acquisition and transfer of land, or interests in land :—the second a question of fact, as to the surrender of the rights acquired under the agreement.

*First,* then, as to the effect of alienage.

There can be no force in this objection; because, "That an alien can take by deed, and can hold till office found, must now be regarded as a positive rule of law, so well established, that the reason of the rule is little more than a subject for the antiquary." *Governeur's Heirs vs. Robertson,* 11 *Wheaton,* 366. *Creigh vs. Radford,* 3d *Wheaton,* 599. *Orr vs. Hodgson,* 4 *Wheaton,* 460. *Bacon's Abr. Aliens* C. *Buchanan vs. Deshon,* 1 *H. & G.,* 289.

*Second,* as to the abandonment.

The evidence of this is presumed to be found in the correspondence; and in the fact, not denied, that the mine was not worked by *Petherick* or the appellant from the time that the exploration was completed, and the appellee paid for making it, up to the filing of the bill.

The correspondence consists of many letters. There are two filed by the appellant, and eleven by the appellee.

Bearing in mind, that we are examining them, with a view to see how far the charge of abandonment is sustained, we turn to a few of them; and pursuing the order of time, we go first to those filed by the appellee.

Appellee's exhibit 5, p. 17, 15th August 1844. *Petherick* writes to *Watts,* (appellee,) and, after some remarks about the accounts of the latter, for the cost of the exploration, says, that he "intends to associate others with him *(P.)* in the prosecution of the mine."—And further, "I will trouble you to see *Mr. David Stewart,* and shew him your title, *that he may prepare a deed in conformity with an (our) agreement, for the mine.*" And again, "I shall send regular miners to sink deeper the pit."

This letter is important, introduced, as it now is, by the appellee, because it shews a well understood purpose between the parties to consummate the agreement by a formal deed ;—

just such a deed as is now claimed at the hands of the appellee; a deed to be prepared by the counsel of *P.* The letter contains, also, at *W's* request, a table of the seignorages paid in *Cornwall;* shewing that the rent for the *future* working of the mine, was looked to by *W.* and *P.* both.

Appellee's exhibit 6, p. 18, 22nd August 1844, *Petherick* to *Watts.* In this letter *Petherick* agrees to give *Watts* $60 for the work of the exploration, or $20 in addition to the $40 already paid. He directs him to call on *Mr. Stewart* for the money, and says, "Don't forget to give *Mr. Stewart* the necessary papers *to make out the deed,* as I wish to have matters put in proper train for proceeding with the further trial."

Appellee's exhibit 7, p. 18th September 26th, 1844, *Petherick* to *Watts. Petherick* says in this letter : "The matter now rests, not from any neglect of mine, but to have the deed completed, which I expected could have been done before this, and I shall write to *Mr. Stewart* by this post urging him to expedite it. Notwithstanding my wish and intention to proceed with the works, still, as the matter now stands, if you are desirous to engage with the parties whom you mentioned, as being waiting to embark in the undertaking immediately, I shall not object to admit them, and to retire; provided they will *immediately* reimburse me my actual outlay, including my traveling expenses, and *Mr. Stewart's* bill ; but not charging anything for my time and attention to the business. If you wish to avail yourself of this, please to inform me promptly, for my government in the matter, otherwise I shall, on having the deeds, associate friends with me in the business; which I believe will prove a remunerative one. Requesting an early communication from you," &c.

Up to this time there was no abandonment, clearly; for we find *P.* offering to sell out to *W.* on terms, which *W.* never accepted.

Appellee's exhibit, No. 8, 23rd January, 1845, *P.* to *W.* In this letter *P.* again puts the delay on the failure to have the deed prepared; speaks of an arrangement he had made with a *Cornish* miner, to take an interest at *Bare Hills,* in the

beginning of December; says he has done all that could be expected of him under the circumstances, and adds: "If however, you think this delay important, and have desirable parties to go into the business, I shall have no objection thereto, on the terms mentioned in my letter of the 26th September last, if you prefer it, *and will give me reasonable notice for my government.*"

Appellee's exhibit 24th February 1845.—*P.* to *W..* This letter is in answer to one from *W.,* dated 20th February 1844, in which *W.* says, "I find you continue in the same mind to come on to work my copper mine." And then solicits a loan of money to pay off a debt due on the place. *P.* replies, "that it will not be convenient for him, at present, to make any advance beyond what will be required in connection with the party," referred to the letter of the 23d January, who has not yet returned to the country. In a postscript, *P.* again says, "if it will be of any assistance to you, in raising the money, I shall be disposed to transfer my interest in the property, on the terms mentioned in the letter of the 26th September."

The next letter in the record is, filed by appellant, from *W.* to *P.,* 9th May 1844, in which *W.* asks whether *P.* "intends to come on and work the mine or not, and at what time. If you have declined," he says, "please inform me by return mail."

At this time there had been no abandonment, clearly, in the estimation of *W.,* nor does he produce any letter from *P.* announcing the fact that he had abandoned the agreement.

The next letter of *P's,* filed by the appellee, is the letter of 6th October 1845, in which, after accounting for his delay in replying, *P.* says: "I have been in communication with a gentleman residing at *Baltimore,* who is disposed to enter into the concern in your property at *Bare Hills, under my agreement with you,* which I think better for all parties, than for me to wait for the assistance of the person in *Connecticut;*" referred to in the letter, &c.

We have thus gone through the correspondence, with reference to the allegation of the answer, that *P.* had abandoned

18      v.7

the agreement, and that *W.* had released him from its obligations ;—and instead of the allegation being sustained, we find it utterly contradicted.   At the date of *Watts'* last letter of May 1845, we find him recognizing the existence of the agreement; and there is no pretence, that after the letter of October 6th, in which *Petherick* speaks of a gentleman in *Baltimore* disposed to enter into the concern, *under the agreement*—a letter which is produced by *Watts* himself, and which shows that *Petherick* still held on to the agreement,—there is no pretence, that, after this letter, *Watts* ever denied the right of *Petherick,* until long after the latter had transferred his rights to the appellee, the gentleman in *Baltimore,* referred to.

We may safely say, then, that so far as the defence rests on the *fact* of abandonment, it must fall to the ground.   There certainly was no actual abandonment, such as is alleged in the answer, and no "release" of the "claims and demands" which *Watts,* in the answer, says that he released; and the admission of the existence of which, is an admission on his part, of the mutuality of the contract.

But it may be said, that the time which elapsed between the completion of the explorations and the filing of the bill, without anything being done in the way of working the mine, affords ground on which an abandonment may be inferred.

In the first place, the inference cannot prevail against the acts of the parties; and the correspondence shows, that, up to May 1845, *Watts* did not consider the contract abandoned; and that in October 1845, when *Petherick* spoke of selling to a gentleman in *Baltimore,* he, *P.,* believed it to be in full force.

But the rule, with regard to time, as of the essence of contracts, is a very plain one.   It is stated briefly, in *Pratt, et al., vs. Law, et al.,* 9 *Cranch,* 456, 494, that time is made material to the specific performance of a contract, whenever, from the change of circumstances, a specific performance, such as would answer the ends of justice between the parties, has become impossible.   *Brashear vs. Gratz, et al.,* 6 *Wheaton,* 528.   *Garnett vs. Macon,* 2 *Brockenbrough,* 245.

Even this, however, is in cases where time is limited by the terms of the agreement. But in this case there is no time limited, by the agreement, for the commencement of the *working*, as we have seen. The time to begin exploration is fixed, and that is all.

But what.are the facts, as charged in the bill, and admitted by the answer, and which address themselves to a court of equity? Why, that at the time the agreement was made, and at the time the bill for specific performance was filed, *Watts had no interest which could be prejudiced* by the failure, on the part of *P.*, to work the mine forthwith. *Watts* was the owner of the farm, *in reversion after the death of his mother, the tennant for life*, who was then living. The agreement which he made with *P.*, bound him, *W.*, only. It had no effect upon *her* interests. True, *Watts* says in his answer, that he had an understanding with her; but this is not responsive to the bill, and there is no proof of it; and, at all events, *P.* was without notice of it, so that, so far as *P.* was concerned, *W.* was agreeing to give to him a present interest in that which did not belong to him, an estate in the fee, while he was entitled to the reversion only.

It certainly does not rest with *W.*, then, to complain of the failure of *P.* to work the mine, during the mother's lifetime. As we have seen by the correspondence, *P.* again and again asked for a deed, in conformity with the agreement, and as a preliminary to going to work; a reasonable demand, which *W.* admits, in point of fact, by his answer, his obligation to grant, but for the alienage of *P.*, and the alleged abandonment of the agreement:—these being the only grounds on which he resists the claim for specific performance.

If, then, he had no other title to convey to *P.* but a reversionary one, how can he, in a court of equity, complain of *P's* not working the mine during the life of the tenant for life, from whom he had no authority to work it; and when the failure to work it caused no injury to *W.*

All the cases where specific performance is resisted, on the ground of abandonment of the agreement, rest on the injury which is done to the party, against whom the bill is filed, by

the neglect of the complainant. But, in this case, the party resisting was in no condition to be injured.

It may not be necessary, but reference is made to 2 *Sugden*, 28, for the law, and the cases illustrating it, in regard to the right of a purchaser to insist on such title as the vendor may be able to give, although less than that stipulated for; and although no injury would be sustained by the purchaser in case the agreement were not executed. The law on this point was not denied in the argument below: see, also, 2 *Story Eq.*, sec. 779, &c., on the same point, and cases there cited.

The fact, that the bill is filed by the assignee of *P.*, with whom *W.* has made no agreement, is suggested by the chancellor in his decision; but it is not argued or dwelt upon. But the agreement is one which expressly includes the assigns of *P.*; and whatever weight the suggestion, under other circumstances, might be entitled to, it certainly cannot prevail against the assignee, who, by seeking to enforce performance of the agreement, recognizes the obligations of *P.* as binding on him, and admits that their existence is a necessary preliminary to the enforcement of the rights which he claims, as against the appellee. Specific performance will be decreed at the instance of a party entitled to the benefit of an agreement, though not a party to it. *Hook vs. Kinnear*, 3 *Swanston*, 418. Where a contract is signed by one party only, the other, by filing a bill for specific performance, makes it binding on himself. *Martin vs. Mitchell*, 2 *Jac. and Wal.*, 427.

At the argument before the chancellor, the counsel for the appellee cited and relied upon, in addition to the defences of the answer, the case of *Geiger and Green*, then recently decided in this court; and the chancellor waiving, in his decision, the points of alienage and actual abandonment, decided that the present case was governed by the case of *Geiger and Green*, and dismissed the bill, because of the uncertainty and want of mutuality in the agreement. It becomes necessary, therefore, to look at the case in the light in which it has been considered by the chancellor, and test it by the law, as laid down by this court in *Geiger vs. Green*.

The principle settled in *Geiger vs. Green*, is, that "unless

there is to be found in the contract the essential ingredient of mutuality, a court of equity will not compel its specific execution,"—and the contract, in that case, not containing this ingredient, the bill was dismissed.

Now, is the contract between *P.* and *W.*, the same in this respect, with the contract in *Geiger vs. Green ?*—Because if it is, there is an end of our case. Upon establishing a difference, upon shewing that our contract has the mutuality which the other wants, must our success depend.

The contract in *Geiger vs. Green*, is in the following words : "I hereby grant to *Richard Green* the privilege of digging and mining the ore on that part of my place joining *Welderson* and *Price's*, at twenty-five cents per ton, for the privilege of ground, leave also to build a house on said land, the workmanship to cost one hundred dollars: the materials to be got on my land at said *Green's* expense."

This was clearly nothing but a license, revocable at the pleasure of the grantor. It was a privilege to dig ore at a given rate per ton. There was no obligation on the part of *Green* to begin to dig; or, having begun, to continue. If he dug, he became liable to pay the rate agreed on, and this was the extent of his liability; and so this court decided. No time was fixed, during which the privilege should continue; and while digging, therefore, he was clearly a tenant at will.

The contract between *Petherick* and *Watts*, is a very different one. Its recital declares the desire of *Watts* to have his mines *explored* and worked, and the willingness of *P.* to undertake to *explore* and work them;—not merely to explore, observe, but to explore *and work;*—wherefore, that is, in consequence of *P's* willingness to explore *and work*, *W.* agrees to give "to *P.*, his heirs and assigns, full power to make such exploration *and works* on the said farm, as *P.* may think necessary for *such purposes.*" For what purposes ? Why, for the purposes which *Watts* was desirous to effect, and which *Petherick* was willing to undertake, to wit, the purposes of *exploring and working.* Can it be questioned, then, for a moment, on a careful reading of this contract, that the consideration for it was *P's* willingness *to undertake to work*, as well as to explore ?

and as *P.* was a party to it, and signed it along with *W.*, can there be a doubt that he was bound to *work* the mines, as well as to explore them? and if he was bound to *work* the mines, was not the obligation one which the courts would enforce against him? and if so, has not this contract the ingredient of mutuality, which the contract in *Geiger vs. Green*, is deficient in? The *form* of the instrument by which the undertaking to explore *and work* was made obligatory, is wholly unimportant. 2 *Story Eq.*, 751.

In the decision of the chancellor in the present case, he says: "Although it was the manifest design and object of the defendant to have the minerals upon his farm *worked*, as well as explored, and although, for a small pecuniary consideration he gave *Petherick* full power to make such explorations and works, the only stipulation, on the part of *Petherick*, is, by a certain period, to commence operations for ascertaining, by explorations, the mineral prospects on the said farm. The engagement, therefore, on the part of *Petherick*, was limited to the explorations, and he was not bound, according to my interpretation of the contract, to *work* the mines."

But can this interpretation be the true one? Upon its truth rests the whole of the chancellor's argument. The chancellor says, himself, most correctly, "that the manifest design and object of *Watts* was to have the minerals upon his farm worked as well as explored." Certainly; and does not the contract recite, *as the inducement to its being entered into, the willingness of Petherick to work* as well as to explore. How, then, can it be said, that, having been assented to by *P.* signed by him, and the execution of it commenced by him, the contract does not bind him to work as well as to explore the mines. The chancellor says that it does not, because "the only stipulation is, by a certain period to commence operations for ascertaining by explorations, the mineral prospects," &c. But does the absence of any stipulation as to the time, at which *the working shall begin*, prove, that the agreement contains *no obligation* in regard to working? Unless it does, the chancellor's argument, it is most respectfully suggested, fails. We are sure it cannot have been intended

by him to say, that, unless a *time for beginning* mining operations is fixed, no contract for mining privileges can be made which a court of equity will enforce. As we have already seen, a contract expressly stipulating for time may be made, and yet the time may not be of the essence of the contract; and, therefore, had the time for commencing the working, as well as a time for commencing the exploration of the mines, been fixed, the courts might have held that it was immaterial in a given case. Suppose, for instance, that accident, without injury to *W.*, had prevented *P.* from commencing explorations till the 11th of July 1844, instead of upon the 10th July, the court would not have vacated the contract had it been otherwise good, on that ground. If then, the fixing of a day for the beginning of the working, would not, necessarily, have caused the annulment of the contract had that day not been observed, so the failure to fix a day would not make the contract invalid; and if so, the argument that *Petherick* is not bound to *work* the mines, because no day is named by which he shall begin the working of them, must fall to the ground; and we are left to consider the contract as one binding *P.* to work, as well as to explore, the mines:— naming a day by which the exploration must commence, but leaving the time for commencing the working, after the explorations shall have ascertained the presence of copper, to be determined by circumstances, according to the recognized obligations of the contract.

In another part of his decision, the chancellor quotes the part of the contract already referred to, giving to *P.* the right to make such exploration and works as he may think necessary for such purposes, (referring, as we have seen, to the purposes of exploration *and working*)—as though it was to be inferred from this, that *Petherick* might work or not, as he deemed proper—a feature of the contract, in this view of it, which would deprive the contract, in the chancellor's estimation, of its mutuality.

But if we are right in our position, that the execution by *Petherick* of the contract, the inducement to which was the *working* as well as the exploration of the mines, imposed on

him an obligation to *work*, as well as to explore—then this obligation is one which equity would certainly enforce—requiring from *Petherick* all reasonable diligence; preventing him from playing the dog in the manger; and vacating the contract, if, violating its spirit, he relied upon its terms to uphold him in doing *Watts* an injury:—or the courts of law would give to *Watts* damages, if he chose to resort to them, instead of seeking equity for redress.

But there are yet other points of difference between the contract in this case and the license in the case of *Geiger vs. Green.*—While the agreement with *Green* was without other consideration than the prospective payment for the ore, as raised, the agreement between *Watts* and *Petherick* required that the latter should make, at his *own* expense, and for *Watts'* benefit, those explorations which were to determine the mineral prospects of the farm; for, although the agreement recited the fact, that there was copper and other minerals on the farm, yet the ascertainment of their position, and the mode of getting at them, was evidently of great consequence to the owner of the land. It so happened, that these explorations cost but $60 or $70; but, whatever they might have cost, the rights of *P.* depended upon his making them at his own expense;—that they were sufficiently made for the purpose intended, is not denied; that it cost but little to make them, was fortunate for *P.*, but having made them by the time stipulated, the rights which the making of them gave to him became vested, and a contract, involving mutual obligations, was the immediate result.

The chancellor, in his decision, cites the case in 1*st Schoale and Lefroy,* 18; but he omits a part of the opinion of *Lord Redesdale;* which appears to us to have an important bearing on this case. There is the same omission in the quotation, from the same opinion, which is given in the case of *Geiger vs. Green. Lord Redesdale* says, "I have no conception that a court of equity ought to decree a specific performance, *in a case where nothing has been done in pursuance of an agreement,* except where both parties had, by the agreement, a right to compel a specific performance," &c. The omis-

sion consists in leaving out the sentence, "in a case where nothing has been done in pursuance of an agreement," and results from the chancellor's having taken the quotation, probably, from the decision in *Geiger and Green*, and not from the reports. Now, in *Geiger and Green*, the words were doubtless omitted, because, in fact, unimportant; for there, nothing had been done, or was to be done, in pursuance of the agreement, in order to give it a binding character: the agreement there, was, as we have seen, nothing more than a naked and revocable license. But, in the present case, the contract was, by its terms, made to depend on *something that was to be done* by *P.*, which having been done, the case in *Schoale and Lefroy* not only loses its force as an adverse one, but becomes an authority on the other side, on the point that we are now considering, to wit, that the execution of the contract, as far as required by its terms, by *Petherick*, gave him rights under it, which a court of equity will enforce by a decree for specific performance; and thus distinguishing this case, in this particular also, from the case of *Geiger vs. Green.*

Again.—The agreement in the case of *Geiger vs. Green*, was perfected by the execution of the written instrument, which is set forth in the court's opinion. It looked forward to no further act of the parties for its perfection; and its effect was to prevent *Green* from being considered a trespasser, and to settle the rate to be paid for the ore dug by him. But in the case now before the court, *Watts*, "for himself, *his heirs and assigns*, in consideration, &c., agrees to give to *Petherick, his heirs and assigns*, full power," &c. The terms employed look to a further act. The object to be accomplished, a conveyance of a mining privilege in perpetuity, binding upon *Watts, his heirs and assigns*, could only be accomplished by a deed acknowledged and recorded according to law. The agreement was executory in its character. *P.* was to make certain explorations by a given day;—having made these, *Watts* was to *convey* to him, his heirs and assigns, the right to mine. When the explorations were made, the contract became executed, and *Petherick's* right to the conveyance perfect. The contract was not for the right to *explore*, but the right to mine:

19      v. 7

which was to be given when the explorations were made, at *Petherick's* expense, by a given time. That such was the intention and understanding of the parties, is proved by the correspondence, where we find that operations are postponed on account of the non-execution of such a deed:—the failure to execute which is attributed, not to any objection on the part of *Watts,* but to the absence and engagements of counsel. None of the objections taken by the chancellor, were raised by *Watts,* when such a deed was asked for. Even when litigation commenced, the refusal was not put on such objections, by the answer which *Watts* filed under oath. They were afterwards suggested by the decision in the case of *Geiger vs. Green,* in which there was no agreement to give a deed. They are objections which amount, in fact, to a suggestion, that the consideration is inadequate:—not a suggestion made by the party to whom the consideration enures, when called upon by the proceeding in chancery to perform his agreement, but by counsel, in the argument of the cause.

We proceed now to enquire, whether, independent of that case, the present bill for specific performance should be sustained.

In the language of *Chancellor Kent,* adopted by this court in *Geiger vs. Green,* and dwelt on by the chancellor, "unless the court is satisfied that the contract is fair and just, and equal in all its parts, and founded on an adequate consideration, it will not, by the interposition of its extraordinary power, order it to be executed."

Taking this to be the established law, the question is, whether the contract in question is such a contract as is here described?

That it is equal in all its parts, by which we understand mutual in its obligations, we have already argued.

Whether it is fair and just, and founded on adequate consideration, remains yet to be considered:—as well as to shew, that there is not that objectionable uncertainty in its provisions, upon which the chancellor, in his opinion, dwells.

In construing a contract, the court will look to the motives that led to it, and the objects to be effected by it. *Davis vs. Barney,* 2 *Gill and Johnson,* 382. The situation and true

intent of all parties, and *the subject matter*, are to be considered in determining the meaning of a contract. *Hollingsworth vs. Fry*, 4 *Dall.* 345; and other cases referred to in *Chitty on Contracts*, 74. Now, the strongest evidence that we can offer of the fairness, justice and reasonableness of the consideration of the contract, is to be found in the fact, that *Watts* himself, in his answer to the bill, makes no objection to it, as we have already remarked, on any of these grounds. Bear in mind, too, that it was not an ordinary contract for the conveyance of land, or the performance of work, but it was peculiar in its character, relating to a subject about which it is not every one that is conversant, and which was entered into, as *Watts* also states, in his answer, in consequence of the knowledge of its subject matter, which *Petherick* possessed, and which, it is to be inferred, from what he says, was not possessed by every one. When a contract of this kind is sought to be enforced against a party most anxious to avoid it—aided, too, by astute and able counsel, we may well suppose, that if it was unfair, unjust, or wanting a proper consideration, these defences would be made in the answer, unless the party was prevented by the fact, that his answer was under oath. This part of our case, then, we are well satisfied, shall rest upon what we thus think to be the testimony of *Watts* himself.

But, as already said, the chancellor refers to the "*uncertainty*" of the provisions of the contract. This is a defect, apparent, if it exists at all, on the face of the contract, and requires notice here. It may be said, that the argument already applied to the fairness, &c., of the contract, would also apply to its certainty; but, in point of fact, as will appear in a few words of explanation, the contract is as certain, as the nature of the object to be accomplished, required, or properly permitted.

There can be but two objections to the contract, on the ground of uncertainty :

1. That no time is fixed upon for commencing operations.

2. That no amount of work to be done annually, or within a given time, is stipulated.

1. The first of these objections has already been considered.

2. With regard to the amount of work to be done in a given time:—this it would have been impossible to fix in any contract, which a prudent man would have entered into. It would depend upon circumstances wholly uncertain. Copper is often found in masses, and is afterwards traced, by faint indications only, through the earth. The product of a mine may, for a month, yield a handsome return; afterwards, for several months, there may be no return at all for the labor that is expended. The labor of .months may be thrown away on the hope, that *indications* will prove true. These are facts of notoriety. Few of the copper mines of this country have answered expectations. Copper mining here is a lottery. If the *prospect* was a good one, no stipulation would be required to induce the miner to push forward, and the seignorage would be large proportionally. If it was bad, a stipulation, which would require him to dig in the earth, without return to himself or the proprietor, would be oppressive and unjust; and even if it were contained in a contract, equity would relieve against it.

In fine, the contract which has been made is the only one which any one, having due knowledge, could, with prudence, make. And we contend that it is sufficient for all honest purposes, inasmuch as the courts will always interfere to enforce the performance of its obligations:—either in equity, by compelling it specifically, or in law, by giving damages for their infraction. In the meanwhile, good faith is always to be presumed; and until *W.* is, at all events, in a position to insist that the mines shall be worked, which as reversioner he is not, any assumption that bad faith is intended, either by *P.* or his assignee, is utterly gratuitous. Indeed, the very filing of the bill to enforce the performance of the agreement, shows an appreciation of the value of the mine, that forbids the idea that it will be suffered to lie idle and unproductive.

We have thus gone over all the grounds of objection taken to the demand for specific performance, apparent either on the face of the record, or suggested in the argument below, or by the chancellor in his decision. We have shewn:—

1. That the alienage of *P.* is a matter that cannot be inquired into unless by office found; and does not affect

the question now before the court, to which it is wholly collateral.

2. That in point of fact, there was no such abandonment of the contract as *W*. sets up; no such release from its obligations, as he alleges that he gave to *P*.

3. That no abandonment can be inferred from the delay which took place in working the mine, up to the filing of the bill, because the *correspondence* sufficiently accounts for the delay; and because, while *P*. and his assignee were both perfectly willing to accept a conveyance of the reversionary interest, when it was found that *W's* mother had a life estate in the property, yet the absence of all right in *W*. to work the mine in his mother's lifetime, deprived him of the power to insist upon its being done, and made any postponement on the part of *P*. immaterial.

4. That the contract, the consideration of which was the working, as well as the exploration of the mines, was binding upon *P*. according to its terms, as soon as he signed it; that his obligations in regard to it were such as the courts would enforce, and that, therefore, it possessed that essential ingredient of mutuality insisted upon by the authorities.

5. That according to the appreciation of the parties, who were best qualified to judge, the terms of the contract were fair and just, and the consideration sufficient; and that there was all the certainty in its terms which the nature of its subject matter admitted; and all that the defendant below, who resisted its performance, required, even after the commencement of the present litigation.

Upon these views we ask a reversal of the chancellor's decree.

By T. PARKIN SCOTT for the appellee, who contended :—

1. The complainant, or his assignor, is not bound by the terms of the agreement to work the mines, but only to ascertain, "by exploration, the mineral prospects on the said farm." The agreement was drawn by *Petherick*, and he seems to have endeavored to secure to himself, "his heirs and assigns," full control over the mines, without incurring any obligation to

work them, but only to explore;—thus holding out to the defendant, the delusive hope of revenue, with which to pay his debts, without the power to gather it.

The agreement is, in this particular, almost verbatim with the agreement in the case of *Geiger vs. Green*, decided by this court at December term 1846, and that case decides this. The decree dismissing the bill must be affirmed.

The counsel for the appellant seem to have felt the force of this authority, and therefore they have devoted themselves principally to distinguish the cause before the court, from the case of *Geiger vs. Green*.

It is most true that the agreement does recite, that *Watts* "is desirous to have the same (the mines) properly explored and worked," and it recites, that *Petherick* "is willing to undertake such exploration and working." But this agreement no where binds *Petherick* to work the mines. He drew the agreement, and made no such stipulation on his part. To *Watts* it is immaterial, whether this omission was by accident or by design, the effect is the same to him. But let us suppose that *Petherick*, and *Tyson*, his assignee, are bound by the terms of this agreement to work the mines; then the question arises, to what extent are they so bound to work the mines? *Petherick* was sometimes kept away by other business, he had to go to *Virginia;* other and important business kept him away, coal mining at *Pottsville* occupied nearly the whole of his time, and produced delay; his counsel, *Mr. Stewart*, neglected to attend to the matter. His *English* friend would not furnish funds for small transactions. Business at *Pottsville* prevented his making arrangements for carrying on the operations at *Bare Hills*.

Thus it seems that more profitable engagements elsewhere kept *Petherick* from *Watts'* copper mines. He knew he was not bound to work them; or, if he was bound, it was only to a nominal extent, that would not yield *Watts* any revenue; and yet *Petherick* had, as he supposed, secured to himself the exclusive privilege to work the mines. *Tyson* also may have more profitable business,—he may have other mines, and not wish to overstock the market, whilst poor *Watts* is to suffer.

Is there any mutuality in this contract?

The appellant's counsel seems to think, that *Watts* is precluded from making this objection of the want of mutuality in the appellate court, because they suppose this defence was not taken in the answer, although they admit it was relied on in the argument below. The appellee's counsel conceives that his opponents are mistaken, both in regard to the fact and the law. It is true, that in the answer this defence was not taken by the use of the words "no mutuality," in speaking of the agreement: but the defence was substantially taken by the defendant setting forth the contract, and the circumstances under which it was made, and then denying that he is bound at law or in equity by the said supposed contract, to execute any deed. But even if this defence had not been thus taken by and in the answer, the want of this "mutuality" is patent on the face of the agreement; and the whole bill and the record shews a want of equity in the prayer of the bill and the relief sought. To grant the prayer of this bill, would not be to do equal justice. 8 *Cranch,* 471, *Pratt vs. Carroll, page* 222 *of* 3 *Peters' Cond. S. C. Reps.* 1 *Fonblq.,* 189, *note (i.) Story Eq. Juris. S.* 742.

It is objected by the appellant, that *Watts* was only entitled to the reversion of this property, after the death of his mother. There can be no dispute on this point;—tenant for life has no right to open new mines, without the assent of the reversioner or remainder man; and the reversioner or remainder man has no right to work the mines during the continuance of the life estate, without the consent of the tenant for life. But *Watts* asserts that he had the consent of his mother; and certain it is, he commenced the explorations, and opened the mine under *Petherick's* directions, without objection from his mother; and there is no allegation that she did object; and no allegation of any offer to prosecute the work, either by *Petherick* or by *Tyson. Story's Eq. Juris., sec.* 771; and from the fact that the explorations and opening of the mine was done whilst she was in possession, and without objection, and from the attendant circumstances and the relationship of the parties, we may reasonably conclude that she gave her assent.

Time was of the essence of this contract.    *Watts* was in debt; his debt was about to become due and payable, and he wanted means to pay it, as well as revenue for support.    It is manifest, as well from the nature of the agreement,—the explorations,—the frequent regrets and apologies of *Petherick* in his letters, and his promises to send the miners on to the work,—that when it was made, *Watts* contemplated an immediate working of the mines.    It would have been better for *Watts* not to have known of his hidden wealth in the bowels of the earth, if he could not make it available.    Our worthy opponents had more profitable business on hand.

2. *Petherick* is an alien, and never resided in *Maryland.* The defendant, therefore, insists, that *Petherick* could not make a valid transfer of real estate to *Tyson.*    It is not denied but that an alien may purchase, and hold until office found; but he purchases for the benefit of the king; here, of the State, and he cannot transfer.

"If an alien christian, or infidel, purchase houses, lands, tenements or hereditaments, to him and his heirs, albeit he can have no heirs, yet he is of capacity to take a fee simple, but not to hold; for upon an office found, the king shall have it," &c.    *Co. Litt.*, 2 *b.*   1 *Thos. Co. Litt.*, 91.

"Many that have capacity to take, have no ability to enfeoff, &c., as aliens born," &c.    *Co. Litt*, 42 *b.*   1 *Thos. Co. Litt.*, 92.

The *Supreme Court of the United States*, in the case of *Fairfax's Devisee vs. Hunter's Lessee*, reported in 7 *Cranch*, and also in 2 *Peters Cond. Reps., page* 627, say, that an alien "may convey to a purchaser—although *Co. Litt*, seems to the contrary—yet it must probably mean that he can convey a defeasible estate only, which office will divest.    This court, in *Buchanan vs. Deshon*, 1 *H. & G.*, 289, has said: "An alien may purchase lands, and hold them against every one, except the State, until office found, or until the government shall . exercise its authority over them."    If, then, *Watts* was to convey either to *Petherick*, or to *Tyson*, his assignee, the estate conveyed could be claimed by the State, and thus *Watts* would be involved, and defeated or delayed in the enjoyment

of the revenues from his mines, contemplated under this agreement. A court of equity, in its sound discretion, will not decree a specific performance of such an agreement, even if there was a "mutuality" in the contract, which there is not.

The court will observe that our case is entirely clear of the objection in the case of *Jones vs. Belt*, 2 *Gill*, 106. *Watts* does not object because he cannot give that which he stipulated for; but he objects because the contract, as drawn by *Petherick*, is not equitable; and the complainant has not performed his part, and may not, most probably will not, be able to perform; and because now, he, *Watts*, cannot obtain that consent of his mother and his mortgagee, which he once could have obtained, and which has been defeated by the acts of the complainant, who has bought up the mortgage.

3. If this agreement is not obnoxious to the objections of want of mutuality, and of incapacity on the part of the said *Petherick* and *Tyson* to perform it, yet this court will not now decree a specific performance against the appellee; because the delays, the failure so far to perform, or to *offer* to perform on the part of *Petherick*, and of *Tyson*, and the acts of *Petherick* in neglecting this, to attend to other more profitable business, amount in fact to an *abandonment* on their part, and have already occasioned much loss in revenue to *Watts*, withholding the means, with such revenue, to enable him to pay his debts, and particularly such mortgage debt, bought up and held by *Tyson*. The letters of *Watts*, produced by *Tyson*, shew a constant and continued complaint of the delay; and the letters of *Petherick* admit it, and attempt to excuse it, by stating other business engagements. *Tyson* is bound by *Petherick's* acts and declarations. 12 *Gill & Johns.*, 35, *Clary vs. Grimes*. *Tyson* does not pretend to have sustained any loss. He knew of the difficulties in his way before his purchase from *Petherick*. He has, perhaps accidentally, misstated the dates and terms of the agreement. He has endeavored to deter others from contracting with *Watts*, misstating the dates of the contract, by alleging it to have been in 1840, instead of 1844. He did not pay any thing to *Petherick* for the contract; at least the assignment does not state any con-

sideration, and there is no proof of his having paid any thing. He has no equity to sustain his claim.

For these reasons the appellee's counsel contends, that the decree of the chancellor ought to be affirmed.

MARTIN, J., delivered the opinion of this court.

It appears from the record in this case, that a bill was filed in *Baltimore* county court, as a court of equity, on the 24th of June 1846, by the appellant, as the assignee of *Thomas Petherick*, against the appellee, for the specific performance of an agreement, alleged to have been made between the appellee and *Petherick*, in June 1844.

The agreement is in the following words:

"Whereas *Mr. Thomas B. Watts*, of *Bare Hills*, near *Jones Falls*, in the county of *Baltimore*, in the State of *Maryland*, has, on his farm at *Bare Hills*, above mentioned, copper, and other minerals, and is desirous to have the same properly explored and worked; and whereas *Thomas Petherick*, residing at *Philadelphia*, in the State of *Pennsylvania*, is willing to undertake such exploration and working, the said *Thomas B. Watts* for himself, his heirs and assigns, in consideration of one dollar, paid to him by the said *Thomas Petherick*, agrees to give to the said *Thomas Petherick*, his heirs or assigns, full power to make such exploration and works on the said farm, as he, the said *Thomas Petherick*, may think proper for such purposes, and for the reduction and conversion of the minerals, and to carry away and to dispose of the minerals, subject to the following conditions, viz:

"That the said *Thomas B. Watts* reserves to himself, his heirs or assigns, a seigniorage of one full fifteenth part or share of all such minerals or metals, after the same shall have been rendered fit for smelting, reduction, or use, free and clear of all expenses whatever. That the said *Thomas Petherick*, his heirs or assigns, shall, on or before the 10th day of July next, commence proper explorations, for the purpose of ascertaining the mineral prospects on the said farm.

"That if the seigniorage, above reserved, be found to be less than the average rate of seigniorage, or dues paid to the land

owners, on the ores raised in the great copper mining district of *Cornwall*, in *England*, such seigniorage reserved shall be increased to such average rate, to be determined by arbitration."

There is then a provision in the contract, that *Petherick* shall furnish the appellee with satisfactory references as to his respectability.

The case was removed to the court of chancery. The only testimony taken under the commission issued in this cause, was documentary in its character, and the controversy was submitted to the chancellor, upon the bill and answer, the two agreements, the receipts, the assignment to the appellant, and the correspondence. Upon the 2nd of April 1847, he passed a decree dismissing the complainant's bill, and the correctness of the opinion thus pronounced by the chancellor, is the question raised for our determination on this appeal.

In the case of *Geiger against Green*, decided by this court, at the December term 1847, a bill was filed for the specific execution of a contract, entered into between *Charlotte C. D. Owings* and *Richard Green*, bearing date the 10th of December 1838. The agreement was as follows :

"I hereby grant to *Richard Green*, the privilege of digging and moving the ore on that part of my place joining *Welderson's* and *Price's*, at twenty-five cents per ton, for the privilege of ground, leave also to build a house on said land, the workmanship to cost one hundred dollars, the materials to be got on my land, at said *Green's* expense."

In the examination of this agreement, the Court of Appeals said :

"It is true, that as this mine was worked, and ore raised from it by the appellee, an obligation to pay twenty-five cents for every ton that was produced, would be created. But the contract grants to the appellee the mere privilege of digging ore, and is not compulsory in its character; a privilege to be exercised or not, at his discretion; imposing no corresponding obligations; and if the appellee had considered the agreement into which he had entered injurious, and refused to work the mine, it is apparent from every part of this paper, that the proprietor possessed no power to enforce, in a court of equity, an observ-

ance of the contract. The practical operation of an agreement of this description, is, that while the appellee may use the mine, if he finds it productive, he may refuse to do so, upon discovering that his purchase is disadvantageous, and the owner of the property would be deprived for years of the revenue, which, under other circumstances, might be derived from it."

The court then say :

"A contract so unequal in its stipulations and bearing, which binds one party, while it leaves the other unfettered, as it respects the observance of its terms, in which there are to be seen no mutual or reciprocal engagements, and which must be regarded therefore as unreasonable and inequitable, can never be enforced in a court of equity."

When speaking of the agreement between the appellee and *Thomas Petherick*, the chancellor says :

"Although it was the manifest design and object of the defendant, to have the minerals upon his farm worked, as well as explored, and, although for a small pecuniary compensation, he gave *Petherick* full power to make such explorations and works, the only stipulation on the part of *Petherick*, is, by a certain period, to commence operations for ascertaining, by explorations, the mineral prospects on the said farm. The engagement, therefore, on the part of *Petherick*, was limited to the explorations, and he was not bound to work the mines."

We think, the interpretation placed upon this contract by the chancellor, is unquestionably correct.

The agreement recites, the desire of the appellee to have the minerals upon his farm explored and worked, and the willingness of *Petherick* to explore and work them, and that the appellee therefore grants to *Petherick*, in perpetuity, full power to make such explorations and works, as he may think proper for such purposes, and for the reduction and conversion of the minerals; and yet, when that part of the contract is examined where the conditions are expressed, it is discovered, that *Petherick* has only stipulated for the explorations of the mineral prospects of the farm, on or before the period designated in the agreement.

As in the case of *Geiger vs. Green,* if *Petherick* had worked the mines, the appellee would have become entitled, by the terms of the contract, to a seigniorage of one-fifteenth, clear of all expenses; but if *Petherick,* in the exercise of the privilege granted by the agreement, refused to work the mines, it would be impossible for the appellee, without the interpolation into the contract of new conditions and stipulations, to have coerced its execution through the instrumentality of a court of equity·

After carefully collating these contracts, we think, the case at bar cannot be distinguished from the case of *Geiger against Green.* And that the agreement now under consideration, is obnoxious to the same objection, which was held to be fatal in the case to which we have referred.

Upon this ground, we affirm the decree.

As we consider the case before us concluded by that of *Geiger vs. Green,* it has become unnecessary to express an opinion upon the other points raised in the argument of the cause.

DECREE AFFIRMED.