Johnson,
 
 J.
 

 delivered the opinion of the Court as follows
 

 In order to present ja distinct view of .the numerous questions which arise out of this intricate and voluminous case, we will pursue them through a history of the transactions iii which they originated, and consider them in order as they o&eur.
 

 
 *487
 
 It is well known that at the founding of this city, the proprietors of the soil gratuitously relinquished a proportion of their property to commissioners appointed to receive it.
 

 Morris, Nicholson and Greenleaf purchased city. lands to the amount of fifty millions of square feet, to which quantity they were entitled on the 3d of December,. 1794. ■ Of this quantity, 6,000 lots were purchased from the commissioners; 220' lots of Daniel .Carroll, and the residue of other persons not necessary to be specified in this case.
 

 In the agreement with the commissioners
 
 they
 
 stipulate to chuse the lots by squares ; to build twenty houses
 
 per annum
 
 for seven years | and ur.fcii the year 1796, not to sell without the building stipulation.
 

 In the agreement with Carroll, the division, was to take place by lots ¿ not by selection, but
 
 alternately
 
 in order $ and a variety of building and other stipulations were entered.into, which, not being complied, with, Carroll re-entered on his land, and the contract was finally abandoned.
 

 On the 3d of December, 1794,
 
 Law
 
 entered into, a contract with Morris, Nicholson and Greenleaf for the purchase of 2,400,000 square feet of city land at the rate of five pence, Pennsylvania currency, per foot, for which Law paid them Z.50.000, and took their bond to convey him that quantity of land, in the penalty of Z.100,000.
 

 To secure this bond the mortgage was given which is the principal subject of these, suits.
 

 On the 13th of May, 1796, Greenleaf conveyed all his estate and interest in the Washington lands to Morris and Nicholson, who on the ,26th of June, 4797, executed an assignment of all their interest to these Complainants,. (Pratt and others). Greenleaf afterwards becoming bankrupt, John Miller, one of these Complainants, was made his assignee
 

 1 . In the several-bills and answers relative to these transactions, there are various contradictory assertions on
 
 *488
 
 the subject of fraud
 
 ;
 
 but as there is no evidence to sustain any charge of that kind, and all the various writ-frigs executed, between the parties appear fair, unimpeached and reconcilable, we shall wholly reject the consideration of that subject, and dispose of the case upon the unequivocal meaning of the contracts of the parties, and their various acts which have relation to the execution of those contracts.
 

 By the bond to make titles, dated Dec. 3,1794, Morris, Nicholson and Greenleaf, are simply bound to make . titles to Law, for the specified quantity of land in the city of Washington, leaving the situation of it, and the mode of selection entirely undefined, and of course retaining it to themselves. ■
 

 On the day following, the same parties entered into ■ articles jof agreement, having relation to objects which appear hot to, have entered into their contemplation originally,, and which^on the face of them, bear the appearance of perfect reciprocity. An option is given to Law to decline his purchase ip eighteen months, and Law stipulates that if he should, not then decline it, he shall be bound to improve every third lot pursuant to the original contract of Morris and Greenleaf with the commissioners, in a specified time
 

 On the 10th of March, 1795, Law purchases other concessions. By relinquishing his right of declining the purchase, he is allowed the right of selecting the property to be conveyed to him
 
 “
 
 excepting water property," « and excepting such squares as are now appropriated,
 
 **
 
 or, respecting which the said Morris, Nicholson and « Greenleaf have made arrangements.” A list of the excepted squares is subjoined, numerically distinguished.
 

 Morris, Nicholson and Greenleaf also stipulate to secure Law in the. discharge of their contract by a mortgage of other lands in the city
 
 “
 
 which are now in their « possession, until they can give good and sufficient titles
 
 “
 
 to the said Law, of such property as he may select
 
 “
 
 and of which the titles are not already vested in them.” but Law is to select by squares; to select in ninety days, and to build in conformity with Morris and GrcenlcaFs contract with thetommissioners.
 

 
 *489
 
 From this contract emanated the mortgage of the 4th of September, 1795.
 

 It was evidently incumbent on Law to make'his sejjfec-, lion in ninety days, or shew some adequate cause, to ex-cuso him from the discharge of that part of his agreement. The evidence that he did make his selection in the prescribed time is contained in his amended answer, drawn from him by express allegations in the bill, and an exception to his answer, in which he swears that his_selection was made in due time, and that a copy of his selection, thus made, was, in due time, communicated to the other parties. This fact, therefore, being uncontradieted by any evidence, and confirmed by the solicitude expressed by Law, in all his correspondence, to obtain Ills titles, must be considered ás established, and throws upon the opposite party an obligation to shew either, that he complied with the selection so made, or some sufficient reason why it was not complied with. For these purposes they contend that it was in part complied with, and that it was the fault of Law himself that it was not wholly complied with.
 

 It appears that on the 14th of March, 1796, there were conveyed to Laiv, 792,989 square feet of ground j and on the 20th of July, 1797, 1,155,857 square feet.
 

 In these conveyances Law acquiesces, with two exceptions
 

 1. That 128,223 square feet contained in squares 727, 789, and 729 have since been recovered of him by-due course of law:
 

 2. That in the computation of square feet supposed to he conveyed to him, are included the superficies of the alleys passing through those squares in which the entire squares were not conveyed.
 

 To understand th'is objection it is necessary to remark that, in the division between the commissioners and the proprietors, it frequently happened that several lots in a square were assigned to the proprietor. In the selections made by Mi rris and Nicholson, and in those made bv Law, the of the agreement to chuse by
 
 *490
 
 squares was considered as gratified by the choice of all that part of a square which had been allotted to the commissioners. '
 

 To the first exception, the assignees reply that Law was conusant of the defect of title in the squares alluded
 
 to;
 
 that he took them with his eyes open, and therefore cannot now claim indemnity.
 

 But we do not subscribe to this opinion. There is no evidence, in the case* that- he did agree to take these squares
 
 cum
 
 outre,. The letter of the 1st' of September, 1799, proves nothing of the kind. The condition of the obligation is not complied with by a conveyance of a defective title.
 

 The obligation to convey a good and sufficient title with a general warranty will carry with it the obligation to refund in case of eviction. Law’s knowledge of the incumbered state of the title - is of no consequence whilst the opposite party was under an obligation to make that title good and sufficient The assignees are-, in this respect, in no better situation than the original parties. Their rights and interests are altogether subordinate to those of Law. They take the property in every respect incumbered with the obligation to make good ' the contracts of Morris, Nicholson and Greenleaf with him, not only on general principles, but by txpress exception in favor of existing liens and incumbrances.
 

 With regard to the allowance for the superficies of the alleys, we remark, that if the alleys be comprized under the denomination of streets, the conveyance of the ground which- they cover would be void, and unquestionably will not amount to a gratification of the contract. But from the president’s instructions of the 17th October, 1781, there is reason to think that they were rights of way appurtenant to the lots of each-square respectively. If this claim of Law’s extended to the alleys in those squares of which the whole was conveyed to him, there would, be - some ground for disputing it. But as it is confined to those squares only in which the right could not be merged, because some one or more of the lots were the property of another, we think the allowance ought to be made ; for Law certainly has not acquired a title in fee simple in those alleys.
 

 
 *491
 
 '2. It is contended that it was in Law“s power to have obtained a foil performance
 
 ",
 
 and they charge him with various acts to which alone they attribute the non-compiiance on their part.
 

 1. His frequent varying cf his selections.
 

 On this subject there is a great variety of evidence and many contradictory allegations. But upon the whole, it appears that alter acquiescing in a number of changes, the selections' about the last of the year 1796, settled down to 699, 696, and half of 743, and the deficiency, if any, to be supplied out of squares 730, and north of 697.
 

 But Law’s inclination to vary his selections furnishes no sufficient excuse; for a tender of a conveyance conformably to any one of those selections would have been a performance.
 

 On the 5th of December, 1796, it appears a deed'was tendered and this is asserted to have been a legal performance of their part of the agreement. Law contends that it was not because it contained the building stipulation, a distinct; independent contract, and which ought not to have been made a part of this conveyance. This question appears at that time to have beep submitted to counsel and decided in favor of Law. Whether correctly or not, it is now too late to enquire; for it appears to have been acquiesced in, and conveyances executed for nearly the whole of the same land which was. contained in the tendered deed. The conveyance tendered cannot, even if in unexceptionable form, be now considered as a' performance fop the balance 'unconveyed, since the land contained in it constitutes a great part, of that for which, credit'is given upon the
 
 agreement;
 
 and after receiving conveyances in a different form it is surely too late now to contend for,the sufficiency of those tendered.
 

 3. It is contended th,at the selection of.squares 69S 699, and 743 was úot sanctioned by the contract of March, 1795, and therefore Morris and .Nicholson were under no obligation to convey.
 

 It appears that these squares were situated in Carroll’s
 
 *492
 
 land, and, in the division'between Carroll and the Ccm~ missioners, were assigned to the former. They thus became a part of that land out of which-Morris and Nicholson were to be entitled to have conveyed to them their 230 lots, and it is contended that Law’s right of selection Could not extend to these lots because they were to be assigned alternately; whereas Law’s right of selection was to be made by squares out of those, in which Morris and Greenleaf, had the right of selection. It appears .however, that Morris and Nicholson acquiesced in Law’s right tó select, from Carroll’s land, and in a letter of March 19th, 1797, explicitly acknowledges it.
 

 The solution pf this apparent -inconsistency is to be found in an observation previously made on another point in this case. A selection by squares was in practice considered by these parties as complied with when made of all those lots, contained in- any given square which were owned by the party botínd to convey. There could then be no reason for excluding Law from enjoying his right of selection from among the squares contained in Carroll’s land. The objection certainly come® too late at this day. In Morris’s letter to Mr. Crancb, of February 22(1,1796, is contained an express recogni- - tion of the correctness of that selection, or at least of his acceptance, of it in lien of one more correctly made.
 

 This act with its attendant consequences must -be considered by this court as giving legitimacy to the selection though it had been otherwise indefensible.' Had Law beer, then informed that this selection was not authorised by con'vact he would have been thrown on his right to amend bis selection, at a time when he might have done it with little prejudice to his interest. But at this tim^ it is surely too late to retract an assent given nearly twenty year:-1 ago.
 

 With regard to the two other squares selected, as it was only provisional, to make up any deficiency that might exist alter conveying the three positively selected ; until the three absolutely chosen were conveyed, nothing final could be done with thcsc.-
 

 The last objection is founded'on Law’s failure to comply with his building contract.
 

 
 *493
 
 But to this we answer : Law was not restricted as to the specific lots on which the buildings were to be erected. This choice, therefore, extended over the whole, and the obligation was not complete until the whole land was conveyed to him. We are of opinion that the selection was sufficiently proved
 
 ;
 
 and that Morris, Nicholson and Greenleaf were, in default with regard to the deficiency of land. On them, therefore, must fall the consequences, of a state of things produced by their own default.
 

 But there are other reasons, furnishpd by the. case, in support of this opinion.
 

 Law had advanced very considerably in the discharge of his building contract. He asserts (and if is hardly possible to believe otherwise) that he' was originally induced to enter m(o that stipulation in consideration of similar stipulations entered, into by Morris, Nicholson, and Greenleaf with the Commissioners and Carroll, and urges their failure as his excuse in part for desisting from building. But be this as it may, it is impossible for the ingenuity of man to devise any expedient by which a mean of comparison can be resorted to that would enable this Court, or a Jury to ascertain the injury resulting from this cause, or the sum in damages by which it may be compensated. We therefore put the building contract entirely out of the case.
 

 It then only remains to decide what remedy Law is entitled to.
 

 It is contended in behalf of Morris, Nicholson and Greenleaf that it should be by specific performance or by an issue
 
 quantum damnijicatus ;
 
 that, at any rate, it should not be by á decree to refund the purchase money with interest, as the value of the residue was necessarily diminished by the gratification of so largé a proportion of his right to select.
 

 To obtain a specific performance is no object of Law’s bill; it is incumbent on the opposite party therefore to shew some ground of right to force such a decree upon him. But considering, as we do, that Law is not in default, there can be no reason to decree a specific perlor
 
 *494
 
 manee when every thing shews Cnat it would be productive of nothing but loss. Besides, a specific performance, such as would answer the ends of justice befwcen these parties, has now become impossible; Carroll’s property is resumed; a large proportion of the land, purchased of the Commissioners, sold under legal process, and thus the benefit of selection so diminished that if performance were to take placo, it must take place stripped of this its most valuable appendage; whilst the diminution of the value of property, and the change of circumstances, produced by a lapse of twenty years, would render it mockery to call any execution specific.
 

 An issue
 
 quantum damnifeatns
 
 it is certainly competent to thi.s Court; to order in this
 
 case;
 
 but it is not consistent with the equity-practice to order it in any case in which the court, can lay hold of a simple, equitable, and precise rule to ascertain the amount which it ought to decree.
 

 . In this case, the failure on the part of Morris, Nicholson and Grcenleaf, certainly was as early as December, 1796, at a time when there is no reason to suppose that any diminution in the value of property had taken place.
 

 And as to the argument that the value of the right of selection diminished in proportion to the exercise of it; that each subsequent choice was of less value than the preceding, we think it i$ a sufficient answer that Law never appears to have enjoyed the full benefit of his right of selection in consequence of the difficulties which appear at all times to have obstructed his getting titles from the Commissioners or others. And finally when his choice settled- down upon the squares 727 789. and 729, and on Carroll’s squares 696, 699, and half of 7*3, lié was evicted from the three former, and never could get the titles to the three latter. Now these 'squares nearly make up his deficiency and there is reason to believe they are among the most valuable of his choice. At anyirate they appear to have been the favorite objects of his choice. We are therefore of opinion that the rule of equity in this case is that adopted by the Court below; to wit, refunding at the rate of purchase according to the quantity actually deficient j but that interest is to be calculated only from the time when the selections were finallly made, which we fix at 1st of January, 1797.
 

 
 *495
 
 With regard to the actual deficiency it is understood that there will he no difficulty in adjusting it as the measurement and calculations of Mr. King will be acquiesced in.
 

 .We must next determine in what manner the money to be decreed to Law;, in pursuance of the foregoing principles, is to be raised iron: the mortgaged premises; and this leads us to the connexion between the interests of Law, and those of Campbell,- and Buncanson.
 

 Campbell was holder of the negotiable paper of Morris and Nicholson to a considerable amount.
 

 Greenleaf had conveyed to Morris and Nicholson all his interest in the mortgaged premises, so that each of them was entitled to an undivided half part of the equity of redemption. Campbell sued out an attachment against Momsand Nicholson severally, under the laws of Maryland, (as this part of the District was then under the jurisdiction of Maryland) and had it levied on sundry of these mortgaged squares, specifically designating them by their numbers. An issue was made up, and at , tlie trial before the Court to which the writ was.returnable, the question was distinctly made whether the equitable. interest of the Defendants in these squares was the subject of attachment.. That Court decided that they W'ere not; and the Plaintiff appealed to the Court of Appeals to. have their judgment reversed.
 

 On the hearing before the Court, of Appeals the decision of that Court is reversed and the squares attached are specifically and numerically condemned to satisfy the debt due to Campbell. And finally, process issues out of that Court, to the sheriff of the ctnmty, reciting the attachment and condemnation of these squares, describing them with equal precision, and commanding 'the sheriff to make, from the said lands, the money necessary to satisfy .the judgment. Under this writ, the squares, soajondemned, were sold
 
 ;
 
 Campbell becomes the purchaser 5 and Law, at the instance of Campbell, and without the privity of the assignees, executes a release, to Morris and Nicholson, which is put on record j at the samé time taking a bond of indemnity,, from Campbell, against, all,,consequences that might result from this act.
 

 
 *496
 
 Much ability has been exhibited in argument on the question whether an equitable interest in lands and tenemenis be the subject of attachment under the laws of Maryland. But we arc of opinion that we are not now at liberty to enter into the consideration.of that question. The decision of the Court of Appeals is final and concluon this point. The question was fully brought before them ; and although it had not fixed the law, would have fixed the fate of these lands beyond reversal.
 

 Some doubt is entertained, by one member of the Court, whether the laws of Maryland go farther than to authorise, the condemnation of this interest to satisfy the judgment so as to leavc'the Plaintiff still under the necessity of applying to an equitable tribunal to effect a sale..
 

 But the majority arc of opinion thatthc attachment-act, in making this interest tangible, makes it subject to the ordinary process of the Law-Courts, and that in vesting, in the courts in which the condemnation takes place, the power to issue execution as in case of other judgments, it has left it with those Courts so to fashion its process as to meet the exigency of each case.. In this case, the very special nature of the execution shews that it. has been fashioned with -great care and learning. , We therefore hold the sale, under this execution, to be valid.
 

 Some conclusions were attempted to be drawn, in favor of the assignees, from the inadequacy of the price at which the property sold, and from the following state of facts : Greenleaf had issued an attachment, to the use of the assignees, against this property of Morris and Nicholson, a day prior to7 that of Campbell. Subsequent to that of Campbell, Morris and Nicholson as-assign all their interest in this property to these assignees. GreenleaPs attachment was never prosecuted to judgment.
 

 •It is contended that this union between the prior Reis and .the interest attached, defeats the immediate lien.
 

 But.we qannot admit this conclusion.
 

 
 *497
 
 Levying an attachment has the double effect of creating a lieu and instituting an action. But the lien is oniy inciioate
 
 ;
 
 it awaits the judgment of the Court for its consummation, and must fall with the suit. To decide otherwise would be to permit the Defendant, by collusipri, or iiis own act, to nullify the lien of the subsequent attachment.' ■
 

 As to'the inadquacy of price, the evidence is full to shew that it ivas produced altogether by the steps taken by the agents of the assignees to embarrass or prevent the sale, and by the-supposed weight of the incumbrances resting upon the laud, in this respect, therefore^ there is no imputation to be cast upon Campbell.
 

 With regard to the release, it is very evident that, as • it ivas never accepted by the assignees, it ought in no wise to operate to their prejudice ; nor ought Campbell to derive any benefit from it, as it ivas gratuitously proposed Jby him under an arrangement with Law. Give efficacy to this release, and consider how it will operate. Campbell purchases at a reduced price, subject to an Incumbrance ,■ but give effect to this release and he holds an absolute fee absolved from all Encumbrance.
 

 Again, the property, mortgaged to Law, is liable for the whole apxount to be raised for his indemnity
 
 ;
 
 but give efficacy to this release, and whilst Campbell acquires an unincumbered estate, on the one hand
 
 ;
 
 on the other, the residue of the mortgaged property, (that of which the assignees have not been deprived ■ by sale of the sheriff,) must be sacrificed to raise the money due to - Law. From this it will follow, either that a rateable abatement should be made, by Law, proportionate to the squares by him released to Campbell, or that those squares should contribute their due proportion towards paying Law.
 

 Before we proceed to apply these principles to the final disposal of the case, it is necessary ti> shew in what manner the interests of Duncanson and Ward become involved with those of these other parties.
 

 Duncanson at the remtest of Morris, Nicholson and
 
 *498
 
 Greenleaf, and for their use, drew bills on- a variety of correspondents-!» the amouht of 42,000i.
 

 On the 12th of September,. 1795, Morris, Nicholson and Greenleaf, executed a mortgage of eighteen squares in the city of Washington to indemnify Duncanson against the return of these bills. They were eighteen of the squares previously mortgaged to Law.
 

 Of these bills about 7,6001. were returned under protest as the property of
 
 Ward;
 
 and that sum, together with the damages, was paid, on the 26th of D ember, 1796, to Ward by Greenleaf. No satisfaction was entered on the mortgage, nor any assignment demanded until a day long subsequent. The residue of the bills were also returned and paid by Greenleaf.
 

 Thus circumstanced, whilst the mortgage appeared on record in full life, when in fact defunct, as the purpose, for which it was created, had been answered, the attachment of Campbell was levied on thirteen of these squares, and they were finally condemned, sold, and purchased by him. After the sale, notice was given to Duncanson, not to release, and thatan assignment to Miller, the assignee of Greenleaf, would be demanded of him. The demand of Greenleaf, on Morris and Nicholson, arising from taking up these bills, was contained in his assignment to Miller; and this .pay ment is among the items making up the debit side of the account stated between Greenleaf and Morris and Nicholson.
 

 Miller, the assignee, contends that he Í3 entitled to such an assignment from Duncanson, and therefore to be considered in this Court as entitled to all the advantages which he would have derived from such an assignment if actually made.
 

 On the one hand, Campbell had, at the sale, all tlic benefit of this sum as an existing incumbrance upon the land. It was, in fact, so much credited on the purchase money for which it
 
 sold;
 
 but on the other, it is contemned that it was a fraud upon the public to keep up the appearance of an existing, mortgage bn this property when it was in fact satisfied
 
 ;
 
 that the agents of the assignees alone knew this fact, and good faith demanded of them that they should have avowed it.
 

 
 *499
 
 We are of opinion that the answer to this argument is complete. The assignees did not conceive it to be a satisfied
 
 mortgage;
 
 they then supposed, and now con-' tend, that an equitable interest in the security, giveh for the payment of the bills, resulted to Greenleaf for two thirds of the sum paid by him on the bills and passed to them on- the assignment. This reply, whether correct in point of law or not, certainly removes all imputation of fraud. But if it did not, what réason can be assigned, why Campbell should take to himself a benefit from it ? Had it been productive, in any mode, of injury or Joss to him, it might have been urged with some plausibility
 
 ;
 
 but' there is no reason to suppose that any such effect has resulted from it. It could only operate to reduce the sales of the squares j and in this respect all the effects produced by it resulted to his benefit altogether.
 

 One thing-is indisputable; that if this mortgage be decreed satisfied, Campbell has acquired an interest which he never purchased, and acquired that interest in property which ought otherwise, to belong to the assignees. It might peidiaps be mude a question whetherthe whole amount, apparently secured by the mortgage ought not to be made the measure of compensation to the
 
 assignees;
 
 for to that amount it may reasonably be supposed the price of tiie property was reduced at the sale; to that amount''were-they damnified, and to that amount the purchaser was benefited. But it. would not be consistent with the nature, of these purchases to apply that rule to them with strictness. The uncertainty under which a purchase is made, when made subject to an unliquidated incumbrance, gives such a purchase somewhat the nature of a speculation which the purchaser ought, to a reasonable extent, to have the benefit of, if it prove lucrative. It is, therefore, only on the ground of an equitable existing lien upon the mortgaged premises, or equitable claim upon Campbell, that the Court can decree in favour of the assignees. And as Campbell has filed his bill of interpleader, in the nature of a hill to redeem, we think the Court at liberty, when dejreeing in his favour, to impose on him such equitable terms as the nature of tiie case suggests.
 

 The foregoing reasoning proves that Campbell ought in conscience, to make compensation to the mortga
 
 *500
 
 gor, the former proprietor of the fee, for that part of the interest which the mortgage appeared to cóver. He did not purchase it, and therefore, although strict right may secure to him the whole, he ought to be charged with a sum in compensation for the interest so acquired above what was proposed to be sold.
 

 Again, had these bills not been taken up, and the holder prosecuted all the drawers and indorsers to insolvency, there can be no doubt' that the holder would have been entitled, to charge the mortgaged premises, in equity, with the payment of the bills. .But what difference is there, ip equity, between the case of any other' holder ef these bills, and that of Greenleaf, who, when liable, equitably, only for one third, was compelled to take up the whale, and did it with his own funds ? St consists, only in this ; that the one becomes creditor for the whole; the other only for two thirds.
 

 Upon the whole, we are of opinion that the thirteen squares purchased by Campbell should be rateahiy charged with the payment of the debt resulting, under these transactions, from Morris and Nicholson to Greenleaf.
 

 Pratt and
 
 others, Plaintiffs below
 
 v. Thos. Law and Wm. Campbell,
 

 . THIS cause came on to be heard, &c. Whereupon it is ordered, adjudged and decreed; that the decree of the Circuit Court for the district of Columbia, in this casó be reversed and annulled ; and this Court decrees, That the Complainants shall be permitted to redeem the mortgaged premises, exclusive :of those squares purchased by-the said William Campbell, upon paying and satisfying to the said Thomas Law, at the rate of five pence Pennsylvania currency, per square foot, for the actual difference between the imbiber of square feet conveyed to the said Law and the number of 2,400,000. square feet which Morrjs, Nicholson and. Greenleaf were bound to convey, deducting from the number of square feet, said to have-been conveyed to Law, the square ffeet covered by the alleys in those squares in which the entire square was liot conveyed to Law, with interest,' on .the siim so to be liquidated, calculated from the first day of January,
 
 ■1797, at 6
 
 per
 
 cent.
 

 
 *501
 
 And it is further decreed, that towards paying and satisfying the sum so to be ascertained, the said William Campbell do pay and contribute a sum proportionate to the
 
 ratio,
 
 which the squares purchased by him bear to the residue of the premises mortgaged to Law, in quantity of square feet, with interest thereon from' the 1st of Jan-nary, 1797. ’ '
 

 That on payment of the said sum, the said Thomas Law shall re-convey to the Complainants all those squares, or other mortgaged' premises which were not sold as aforesaid: and to the said William Campbell all those squares which the said William Campbell attached and purchased as in bill and answer set forth.
 

 And the Court further decrees, that if the said William Campbell shall not, in six months after the liquidation of the sum to be paid by him and notice thereof, with interest thereon as aforefaid, pay and satisfy to the said Complainants, the sum so liquidated, then the said squares, so purchased by him, shall be sold under order of the said Circuit Court, to pay and satisfy that sum
 
 ;
 
 and that this cause be remanded to the said Circuit Court for further proceedings necessary to carry into effect this decree.
 

 Pratt and others,
 
 Defendants below v.
 
 Thomas Law.
 

 DECREE.
 

 THIS cause came on to be heard, &cWhereupon it is ordered, adjudged and decreed,that the decree of the Circuit Court be reversed, arid annulled ; and this Court decrees, that the said mortgaged premises, whereof the said Thomas Law prays foreclosure, shall be sold, under order'of the Circuit Court, for the district of Columbia, in the county of Washington, to pay and satisfy, to the said Thomas Law, so much of the sum adjudged to the said Law, in the case of these Defendants, against the said Law and W. Campbell, decided at this term, as will be proportionate to the
 
 ratio
 
 which the said portion of the said premises bears to that proportion of the said premises to which' the said Law executed a release in favor of Campbell, as in bill mentioned : unless the said
 
 *502
 
 Complainants shall, in. six months after liquidation of the ¡Said sum, and notice thereof, pay and satisfy to the said Law, so much of the sum as is, in this decree, ordered to be raised. Upmi payment of which sum the said. Law (shall) release to the said Complainants, his interest in the saiu premises.
 

 It is further ordered, that this cause he remanded to the Circuit Court for the district of Columbia, in the county of Washington, for further proceedings to carry into effect this decree.
 

 Pratt and others,
 
 Defendants below
 
 v. William Campbell.
 

 DECREE
 

 THIS cause came on to be heard, &c. Whereupon
 
 it is
 
 ordered, adjudged, and decreed, that the decree of the Circuit Court be reversed and annulled | and this Court decrees, that whenever William' Campbell shall pay and satisfy to John Miller, Junior assignee of James Greenleaf, so much of the two thirds of the sum paid by Groenleaf on the hills secured hv the mortgage to Duncanson as will be proportionate to the
 
 ratio
 
 which the squares bought by Campbell subject to the mortgage, to Duncanson, bear, in quantity, to the whole 18 squares mortgaged to Duncanson, then the said Campbell shall hold the said squares so purchased by him, free and discharged of the said mortgage; and the said Duncanson, and tlie Complainants shall thereupon convey and assign to the said Campbell all their right and interest in the said squares so purchased by him.
 

 And it is further ordered and decreed, that if the said Campbell shall not within six months next after the liquidation of the sum to be- paid by him and notice thereof, pay and satisfy the said sum to the said Miller, then the said squares so purchased by Mm shall be sold under order of the Circuit Court, and the proceeds thereof applied to the payment thereof; having regard nevertheless, to any other existing prior lien upon the said squares
 
 ¡
 
 and this causo is remanded to the Circuit Court for further proceedings thereon.to carry into effect this decree.