WILLIAM RIDER and JONATHAN TROTTER *vs.*
JOHN B. GRAY, and others.

A contract between G. and R. & T., provided, that "in *consideration* of $10.000, *paid*" by the latter to the former, G. agrees to give R. & T. "full power and authority to take from" his mine, "one thousand tons of cinnabar ore, of such quality as they or their agents shall select, and the same to smelt on the premises, or ship it away" for that purpose, "upon condition that they give" him "their obligation to pay over to" him one-third of the "net proceeds" of the ore if smelted on the ground, and one-third of the ore itself if shipped away, less expenses to the point of shipment which were in that case to be paid by him. It also provided, that "proper and legal papers" should "be drawn up as soon as may be, and signed by the parties," when this "*memorandum of agreement*" is to be cancelled. Upon *demurrer* to a bill by R. & T., for the *specific* execution of this contract: HELD,

1st. That it cannot be *specifically executed*, because it is not *mutual, fair, just, certain* and *reasonable*, in all its parts: the fact that a *substantial consideration was paid*, cannot vary the construction of the instrument, or supply essentials in which it is deficient.

2nd. But as the *demurrer* admits the allegations of the bill, that the complainants were deprived of the benefits of the agreement by the *fraudulent contrivances* of the defendant, he must be held to the *confession* and not allowed to *answer*, and *compensation* will be decreed *by the court*, without an issue of *quantum damnificatus*, the *measure of damages* being the amount paid with interest from the date of the agreement.

Where a decree dismisses a bill so far as it seeks specific performance, but retains it for *compensation*, and the defendant does *not appeal*, he cannot, in the *appellate court*, complain of the provision in the decree for compensation; yet the complainants may so complain on *their appeal*, if being entitled to compensation, the decree does not go far enough in that behalf.

A decree dismissed the bill as to specific execution, but retained it for compensation, "*upon condition*" that the complainants, within a certain time, filed the original contract in court to be cancelled, "otherwise the bill to stand dismissed." HELD:

That this condition did not take from the complainants their right of appeal, and if they had filed the agreement without any *protest*, they might have appealed and claimed a reversal or modification of the decree to suit the equity of the case.

APPEAL from the Circuit Court for Baltimore city.

The bill in this case was filed on the 15th of November 1851, by the appellants, having for its object the specific performance of the following agreement:

"Memorandum of an agreement made this 16th day of April 1850, by and between John B. Gray of Fredericksburg, State of Virginia, who represents himself to be the owner of the Abrego Cinnabar ore mine in California, of the first part, and William Rider and Jonathan Trotter, both of the city, county and State of New York, of the second part, witnesseth, that the said Gray, in consideration of $10.000, to him in hand paid by the said William Rider and Jonathan Trotter, the receipt whereof is hereby acknowledged, hath agreed to give, and doth hereby give said William Rider and Jonathan Trotter, full power and authority to take from said cinnabar mines, one thousand tons of cinnabar ore, of such quality as they or their agents shall select, and the same to smelt on the premises, or ship it away to any other place or places to be smelted, with their agreement to give me, the said Gray, thirty-three per cent. of said ore, I paying freight and expenses to the point of shipment, or if smelted on the ground, they are to give me thirty-three per cent of the nett proceeds of the quicksilver taken from it; and I further agree to give, and do hereby give said William Rider and Jonathan Trotter, full power and authority to occupy any land in and about said mine belonging to me, for the purpose of pasturage, or to locate smelting apparatus and dwellings upon for miners, agents, &c., as well as the privilege of taking such quantity of timber and wood from the premises as may be necessary to use for dwellings, furnaces and smelting purposes; and further, to do all other things that they may think necessary to be done, in order to enable them to mine said ore, and smelt or transfer the same, upon the condition that they give me their obligation to pay over to me thirty-three per cent. of the nett proceeds as aforesaid. Proper and legal papers to be drawn up as soon as may be, and signed by the parties hereto, when this is to be cancelled.

(Signed,)     J. B. GRAY.

Witness:—*(J. B. Hubbard.")*

The bill avers this to be a *grant* to the complainants of one thousand tons of ore, to be taken from the mine, with the privilege to take the same on the terms mentioned in the agreement. It then states, that the complainants have not, as yet,

to any extent, availed themselves of this grant, nor received any of the privileges thereof, having had faith in Gray, that he would, in no wise, at any time, do aught to frustrate the same, nor interpose any obstacle to their free access to the mine, for the use and fruits of the grant, whenever they might deem it expedient to avail themselves thereof. The bill then charges that Gray, designing to defraud the complainants of their right thus acquired and vested, has transferred the mine and mining privileges to certain persons, in trust for divers individuals and himself, constituting a joint stock association, styled the "Santa Clara Mining Association," whose stock capital, consisting of this mine and privileges, is established at $350.000, the members being bound to pay their subscriptions in various instalments; that the stockholders, other than Gray, have paid out a small proportion of their subscriptions; that Gray has reserved to himself a very large proportion of the stock which now remains vested in him undisposed of; that in the formation of this association, and creation of this stock-interest in the mine, Gray has made no reservation of the rights of the complainants under their grant, in which respect he has been guilty of a fraudulent default to them, as this omission brings them into conflict and possible controversy with the stockholders of the association, a wrong of serious concern to the complainants, who value their interest under the grant, at not less than $200.000. The complainants then insist, that as these stockholders have not paid their subscriptions in full, and inasmuch as Gray holds an amount of reserved stock, and has in his agreement with the company, reserved a proportion of the ore or of the mines, they are entitled to have their grant carried into full effect according to its tenor, and enforced against any claims and antecedently to any interests of the stockholders and of Gray, and that the latter's alleged interest in the ore and in the mines, stands equally as any of his stock-interest, bound to make good the grant to the complainants.

The bill then makes Gray and the trustees, officers and stockholders of the "Santa Clara Mining Association," parties defendants, and prays, 1st, for a *discovery* of their respective interests in the stock of the association, the number of shares they

respectively hold, the amount they have actually paid and agreed to pay therefor, and of all transfers thereof; 2nd, for a *specific performance* of the contract as against all the defendants; 3rd, that the defendants may be enjoined from transferring any stock or other interest in the mine, until the complainants shall have received their one thousand tons of ore; and 4th, for general relief.

All the defendants united in a *demurrer* to the bill, upon the grounds:—1st. That it does not state a case, entitling the complainants to any such discovery or relief as is sought by it; and 2nd. That the remedy, if any, is at law and not in equity.

The court (KREBS, J.) delivered an opinion, in which, after deciding that none of the defendants were entitled to the defence of *bona fide* purchasers without notice, inasmuch as the facts necessary to constitute such a defence do not clearly appear on the face of the bill, which is admitted by the demurrer, the learned judge thus considers the question, whether the complainants are entitled to a specific execution of this contract?

"An application to a court of equity for specific performance, is addressed to its discretion, and does not rest upon any absolute right to have the prayer granted. This discretion, however, must not be arbitrary and capricious, but sound and reasonable, and governed by principles of justice. *Story's Eq.*, sec. 742. *5 Mason*, 255, *McNeil vs. Magee.* Some of the rules and principles adopted by courts of equity, to regulate their decisions in these cases, are the following, viz:

"That the contract, of which a court of equity will enforce the specific performance, must be mutually binding on each of the parties to it; each must have by its terms a right to compel the other to perform it, according to the advantage which it might be supposed they were to derive from it. 4 *Gill*, 476, *Geiger vs. Green.* 2 *Barbour*, 439, *Woodward vs. Harris.*

"It must be fair, just, certain and reasonable, in all its parts, and it must not appear doubtful from the circumstances, whether the party meant to contract to the extent to which he is sought to be charged. 4 *Gill*, 475. *Story's Eq.*, sec. 751. 2 *Sch. & Lef.*, 554, *Harnett vs. Yielding.*

"The party who asks specific performance must aver and show performance, or a readiness to perform on his part, every thing required of him by the contract, (5 *Mason*, 255, 256; 2 *Sumner*, 296, *Kendall vs. Almy*; 11 *G. & J.*, 446, *Oliver vs. Palmer & Hamilton*,) or a default on the other side which entirely excuses him. He must show himself, in the strong language of many of the decisions, ready, desirous, prompt and eager; nothing but strong controlling circumstances will excuse delay. 5 *Mason*, 263.

"If the plaintiff's case cannot stand the test of each of these principles, he must fail in securing the aid of a court of equity. That they are the principles which must control this court is certain, because the Court of Appeals of this State has regulated its decisions by them in several cases exceedingly analogous, and in one almost identical with it. In *Geiger vs. Green*, 4 *Gill*, 476, Mrs. Owings, by an indenture of writing signed by herself and Green, had granted to him the privilege of digging and mining the ore on a certain part of her place, at 25 cents per ton, for the privilege of ground and leave to build a house at his expense. The court say: 'There is no mutuality in this contract; it is not compulsory in its character; it grants to Green the privilege of digging ore to be exercised or not at his pleasure, imposing no corresponding obligations which Owings had power to enforce in a court of equity. A contract so unequal in its stipulations and bearing, which binds one party while it leaves the other unfettered as it respects the observance of its terms, in which there are to be seen no mutual or reciprocal engagements, and which must be regarded, therefore, as unreasonable and inequitable, can never be enforced by a court of equity.' In *Tyson vs. Watts*, 7 *Gill*, 154, it appeared that Watts had copper ore and other minerals on his farm in Baltimore county, and being desirous to have them properly explored and worked, 'in consideration of one dollar paid to him by Petherick,' (who assigned to Tyson,) 'agreed to give to the said Petherick, his heirs and assigns, full power to make such explorations and works on the said farm, as he the said Petherick might think proper, for such purposes, and for the reduction and conversion of the

minerals, and to carry away and dispose of the same subject to the following conditions, viz: That the said Watts reserved to himself a full fifteenth part of the minerals or metals, and that Petherick should on or before a day mentioned, *commence proper explorations* for the purpose of ascertaining the mineral prospects on the said farm.' The court says, this case is concluded by *Geiger vs. Green,* above cited; that the contract has no mutuality, or reciprocal obligations in it; that it grants to Petherick in perpetuity, full power to make such explorations as he may think proper, for the reduction and conversion of the minerals, and yet when the conditions are examined, Petherick has only stipulated for the *exploration,* &c., on or before a certain time: but if Petherick in the exercise of the privileges granted by the agreement had refused to *work* the mine, it would be impossible for Watts, without the interpolation into the contract of new conditions and stipulations, to have coerced its execution by a court of equity.

"These decisions then, of our own court of last resort, establish:—1st. That a contract without mutuality and reciprocity, cannot be enforced in a court of equity. 2nd. That according to a proper construction of the contracts or grants set forth in the two cases above cited, they are deficient in these qualities.

"The only question left for this court to decide, in connection with this point is, whether the contract or grant recited in the complainants' bill, and which they seek to have enforced, is similar to those mentioned in these cases? They differ in one particular, which however does not touch the question of *mutuality.* Those contracts grant the right or privilege to mine, to an unterminated extent, on the grantor's land:—this restricts the grantees to the mining of one thousand tons of ore only. But the question is, *does it compel them* to mine even that quantity?

"It may be remarked, that they have not as yet *signed it.* But as they come into court to *enforce* it, this objection perhaps would not weigh greatly, if the instrument contained apt words or terms by which they were bound to perform any acts on their part. This contract or grant is almost in the same

words as those in which the instruments of writing in *Geiger vs. Green*, and in *Tyson vs. Watts*, are expressed. It gives Rider and Trotter full power to take from the cinnabar mines one thousand tons of ore, and do all other things that they may think necessary to be done, to enable them to mine said ore and smelt, or transfer the same, they agreeing to give Gray one-third of the ore or of the metal, and upon condition that they give him their obligation *to pay over* the said one-third, but in precise resemblance to the contracts in those cases, it contains no agreement or obligation on their part, to take this ore, or to mine and smelt it, and fixes no time whatever when the mining is to be commenced. It acknowledges the receipt of a consideration, as did that between Watts and Petherick, and upon a careful comparison of these several contracts, I can discover no substantial difference between them. It cannot be doubted that in this case, as in the case of Watts and Petherick, the party owning the ore was desirous to have it mined, and must have looked to his receipts of metal from the mine, as a source of great revenue; for the complainants allege that their proportion of this ore would have been worth $200.000, and Gray, therefore, would have received $100.000, as his share. This large item in the consideration of the grant or contract, is left by its terms to depend altogether upon the will and pleasure of Rider and Trotter, who could not be compelled by any judicial power whatever to perform this part of the contract. I am constrained therefore, in view of the foregoing decisions, and the facts on which they are founded, so closely resembling the facts in this case, to regard this grant or contract as altogether one, which this court cannot execute.

"But is this contract fair, just, certain and reasonable in all its parts, and is it not doubtful, from the circumstances, whether Gray meant to contract to the extent to which he is sought to be charged? According to their construction of it, as set forth in their bill, they insist, it secures to them free access to the mine, *whenever they might deem it expedient* to avail themselves of the grant, and *reduce into their* possession from the mine *their one thousand tons of ore*, and that Gray was in *no wise*, at *any time*, to *interpose any obstacle* to their free access

to the mine for the purposes aforesaid. Is it not exceedingly doubtful from the circumstances, whether Gray meant to contract to this extent? Can it be conceived that he did mean to do so? to bind himself, for all time, to hold his mine to be entered upon and worked *whenever* they might *deem* it *expedient* to commence? No man at this day, when the enterprise of the world is so actively employed, in developing the mineral resources of the earth, and the spirit of speculation is running from land to land in search of the hidden treasure, would knowingly so fetter and tie up his power to dispose of or deal with his mineral property. This grant, according to the complainants' interpretation of it, and that seems to be warranted by its terms, does not appear to me to be so *fair, just, certain* and *reasonable, in all its parts,* as to entitle it to the favor from this court that they bespeak for it. It is certainly liable equally with the contract in *Tyson vs. Watts,* to the objection of *uncertainty,* pointed out by Chancellor Johnson in that contract. He there says, "if this contract is to be enforced against the defendant, the complainant should surely be required to perform the agreement on his part. But what can he be required to do? and when shall he be required to do it? He tells you *himself,* that no time is fixed for working the mines; that is referred *to his discretion.*" So in this case, no time is fixed for working this cinnabar mine, and taking the one thousand tons of ore. That is to be done, as the complainants say in their bill, when they may deem it *expedient.*

"Again, have the complainants averred performance, or a readiness to perform every thing required of them by this contract, or stated any default on the other side which entirely excuses them? In *Oliver vs. Palmer & Hamilton,* the Court of Appeals say: 'It is one of the oldest and soundest principles of equity, that he who goes into a court of chancery invoking its interposition in his behalf, must *allege in his bill* that he has done, or has offered to do, or is ready and willing to do, all that on his part is necessary to entitle him to the relief which *he seeks; or he must set forth* adequate reasons why he shall be excused from doing so.' In that case a party had directed another to pay to a creditor of the former a sum of money, and the writ

ten order giving this direction contained these words: 'On the payment of the above sum, P. & H. will deliver to you my two notes,' &c., 'and relinquish all claims against me.' The court says, this was 'a condition of concurrent performance,' the notes should have been produced, and the release signed, 'and the payment of the money and delivery of the release should have been simultaneous acts; to entitle the parties to demand payment of this order, they must not only *be ready to execute the requisite relinquishment*,' &c. 'This they have nowhere either *alleged* or *proved*, that they ever have done.' Now the contract under consideration contains a condition, which, to say the least of it, is concurrent. The grant of this right to' mine this one thousand tons of ore is made, 'upon the condition that they' (Rider and Trotter) 'give me' (Gray) 'their obligation to pay over to me thirty-three per cent of the nett proceeds as aforesaid.' Now the complainants have not *alleged in their bill*, as it was incumbent on them to do, that they *ever gave*, or *tendered* to Gray, this obligation. Nor have they *alleged* any sufficient reason, or any reason whatever, for this omission. It is true that they have, in argument, relied upon the fact, that Gray having transferred this mine to other parties, they, the complainants, were exempt from this condition, inasmuch as it would have been useless for them to tender their obligation to him after he had disabled himself from performing his part of the contract. But it is to be observed, that the time when this transfer was made is nowhere stated in the bill. The grant is dated the 16th of April 1850, and the bill is filed on the 15th of June 1851, more than eighteen months afterwards. The transfer may have been made, for aught that appears in the case, before the bill was filed, and not until long after this obligation should have been given or tendered.

"The mere fact of the transfer cannot excuse the complainants. If it had really been made so soon after the date of the contract, as not to have allowed Rider and Trotter reasonable time to give their obligation as required, and this had been alleged, it might, perhaps, have excused the non-performance of their part of this condition. The case set forth in the bill is not at all inconsistent with the theory, that Gray may have

called upon them, time after time, during this interval, to give their obligation according to the condition of this grant. And there is a further stipulation in it, which it seems to me imposed an obligation on the complainants, which it is not alleged they performed or offered to perform. It says, *'proper and legal papers* to be drawn up *as soon as may be,* and signed by the parties hereto, when this is to be cancelled.' The complainants do not show that these papers were drawn up as soon as might be, and tendered to Gray. They should have done this, or explained the reasons why it had not been done, especially as they come into court asking for the specific performance of an agreement, which the parties to it did not regard as a permanent instrument that expressed with *proper* and *legal* accuracy their meaning, and contained such obligations as would bind them mutually and reciprocally to the performance of every thing that the 'memorandum of agreement' as they designated it, contemplated. It is perfectly manifest, that they never regarded this instrument of writing as the basis of a *specific performance,* and yet this is the very contract the complainants pray to have specifically executed by this court.

"But further, have the complainants shown themselves ready, desirous, prompt, and eager, in the strong language of the court? They say in their bill, that they have not availed themselves, to any extent, of the grant, nor exercised any of the privileges thereof. This was more than eighteen months after the grant. They do not allege that they had made any explorations or examinations of the mine, or any preparations whatever for taking or mining the ore; or that they or any agent of theirs had ever viewed or taken possession of it or of the premises, that they had expended any money in preliminary preparations or arrangements for these purposes; or that they were, at the time of filing the bill, ready with their servants and agents, or with their funds, to proceed to mine this ore. Now, if the one-third of this ore formed any part of the inducement that moved Gray to make this grant or contract, if it was an item in the consideration for it, and who can doubt that it was the great benefit and advantage that he expected to derive from it, then Rider and Trotter have not been ready,

desirous, prompt and eager, to make this mine yield to him his proportion of the ore to be derived from his share of the profit and advantage to accrue from the contract, as this court thinks they should have been to entitle them to its coercive interposition. If the contract should be executed according to their construction of it, it will depend altogether on their views of expediency whether he will ever derive any benefit under it, for they ask the court so to enforce it as that Gray, and all others under him, shall be compelled to stand off until they, Rider and Trotter, have taken their ore, which it is alleged by them they have a right to take whenever they deem it expedient to do so. In the case of *Crofton vs. Ormsby*, 2 *Sch. & Lef.*, 602, the court says: 'where the performance of the contract is sought by the defaulting party, he cannot enforce it against the person injured by his default.' This case further decides, that where the object of one of the parties would be defeated by delay in the execution of it, if the other party delay he shall not afterwards be allowed to insist on performance. Lord Chancellor Redesdale refers to many cases in support of this position, and says: 'I remember another case, of a different description, where the same thing was held,' and then mentions a case of the precise description of this. 'A contract was entered into by a Mr. Sparrow, with persons who were desirous to have their collieries worked and made productive.' Sparrow delayed for several years the performance of the contract, and when performance of the contract was afterwards insisted on, the Lord Chancellor says, the court declared in these words: 'You cannot have this contract performed, because the object of the parties was to have an immediate income from their collieries,' and then proceeds in his own language: 'in many other cases of this description courts of equity ought to refuse specific performance where the delay would be very injurious to the party sought to be charged.'

"The court has examined this contract carefully, and finds it to be a mere memorandum, or preliminary agreement; evidently not containing the words of obligation designed to make it mutually binding upon the respective parties, upon its face providing for some other obligation to be given by Rider and

Trotter, and stipulating for *proper and legal papers* to be drawn *'as soon as may be,* and signed by the parties,' when it is to 'be cancelled.' For these reasons and those above set forth, this court cannot consistently with the principles and rules established by courts of equity, and the well settled decisions of our own courts, enforce this contract, and must therefore sustain the demurrer."

A decree was then passed, dismissing the bill so far as it seeks a specific performance of the contract; but retaining it so far as it alleges the payment of the money by the complainants to Gray, as the consideration of the contract, for the purpose of affording them such relief as they may be entitled to in reference to the money so alleged to have been paid by them, by decree for its repayment, or of some part thereof, if it should appear that in equity the same or any part thereof should be decreed to be repaid, with liberty to Gray to answer the bill in reference to this allegation and make such defense as he may be advised to rely upon against such repayment: "Provided, that said bill shall be retained for the purpose of affording said relief to said Rider and Trotter, in reference to said money so alleged by them to have been paid, upon the condition, that said Rider and Trotter, within thirty days from the date of this decree, shall file in this court to be cancelled, the original agreement between them and said Gray, a copy of which is filed as an exhibit with the said bill; otherwise said bill to stand and *be absolutely* dismissed against all the defendants with costs."

The complainants then, within the prescribed time, filed the original agreement, with this endorsement thereon: "Original of the paper of which a copy is filed with the bill in this case; this original being required by the decree to be filed, and the complainants filing it now under protest, that this filing is in no wise to be regarded as an acquiescence in said decree, on the part of the complainants, or as a waiver of any rights (on appeal or otherwise) belonging to the complainants in case of not filing this paper." The complainants then appealed from the decree.

The cause was argued before ECCLESTON, TUCK and MASON, J.

*Charles F. Mayer* for the appellants, argued:

1st. That the appellants are entitled to the benefit of their agreement with Gray. It is founded on a consideration actually paid, and is, thus far, an interest equitably vested. In this respect it differs from the cases of *Tyson vs. Watts*, and *Geiger vs. Green*, where, by the vague agreements, the rights of the owners of the mines over the whole estate, for any benefit whatsoever, or any uses, were kept indefinitely suspended for a consideration that *was* to accrue, and to be meted out only at the caprice of the claimants of the mining rights, and at a pace as lagging as they might make it. Proper mutuality, which here was at the very formation of the contract complete on the part of the complainants, was adjudged to be wanting in those cases. Our side of the mutuality of this contract is the $10,000 in *money paid*. This, too, is a bill *to allow*, virtually, the complainants to take out ore, which the introduction by the defendant of the antagonist claims of the company prevented or impeded. 1 *G. & J.*, 227, *Tiernan vs. Poor.* 8 *Gill*, 261, *Alexander vs. Walter.* 4 *Md. Rep.*, 331, *Crane vs. Gough.* 5 *Do.*, 35, *Stoddert vs. Bowie.* 5 *Mason*, 255, *McNeil vs. Magee.* 6 *Md. Rep.*, 430, *Bowie vs. Stonestreet.* 2 *Story's Eq.*, secs. 796, 797, 798. 9 *How.*, 390, *Tayloe vs. Merchants' Fire Ins. Co.*

2nd. If this be a case of specific performance merely, however, and the point of "mutuality or reasonableness" can at all arise, the answer, against all hazards of injustice and all possible complaint of unreasonableness, is, that the privilege of the complainants does not interfere with Gray's using the land and working the mines, and that if we fail to take out our one thousand tons, and all the ore shall have been exhausted by the intermediate mining of Gray or the company, the loss is ours, and to be borne as the forfeit of our negligence. 5 *Coke*, 25, Sir *Thos. Palmer's case.* 2 *Roll. Abr.*, 64, 65. 4 *Bac. Abr.*, 537, *title "Grant."*

3rd. There is no condition precedent that we shall give an

obligation for a third of "the nett proceeds" to Gray—at furthest it is a condition subsequent—but be it one or the other, our bill now asks to be allowed to give the obligation, if not expressly, as part of the very terms on which we seek relief, that all papers in legal form pass between us and Gray. The so called condition, however, refers only to the act and period of our choosing to smelt the ore and sell the product, in which event a specific obligation for Gray's third of the "nett proceeds" might be naturally required, and even then it is to be regarded as but a condition subsequent. 7 *G. & J.*, 239, *Creswell vs. Lawson.*

4th. The equity is clear against Gray and the company to admit our mining privilege to intervene—certainly against the company, if the title to them has not been consummated by their payment of the purchase money to Gray—and, in any event, against Gray for his reserved rights in the sale to the company. 2 *Atk.*, 630, *Story vs. Lord Windsor.* 3 *Peere Wms.*, 307, *Tourville vs. Naish.* 2 *Eq. Cases Abr.*, 685. 2 *Younge & Col.*, 234, *Titley vs. Davies.* We are here upon *demurrer* to a bill charging a *flagrant fraud* upon the part of Gray, and this is an answer to all the charges of *laches* on our part. 3 *Pet.*, 220, *Boyce's Exc'rs vs. Grundy.* Laches must appear, as a *matter of fact*, affirmatively. 14 *Pet.*, 174, *Taylor vs. Longworth.* They should have hastened us by request, or we have our lifetime to perform the contract in. *Coke Litt.*, 208, *(b,)* 219, *(b.)* 2 *Bac. Abr.*, 323, 325, *title "Conditions."* A license coupled with an interest is not *revocable.* 1 *G. & J.*, 366, *Hays vs. Richardson.* That we had no *remedy at law*, see 1 *Story's Eq.*, secs. 64 to 72, 80. 2 *Do.*, sec. 718. 3 *Pet.*, 215, *Boyce vs. Grundy.*

*Charles Marshall* and *Grafton L. Dulany* for the appellees, argued:

1st. That the contract in this case is not, nor was it intended to be, a mere *grant* of the ore to the appellants, but that it contemplates an undertaking on their part to work the mines and take the ore therefrom, partly for their own benefit and

partly for the benefit of Gray, and that upon the face of the memorandum certain acts are required to be done by the appellants as conditions precedent to, or at least concurrent with, the enjoyment by them of any rights under the contract:— 1st. They were to give Gray their obligation to pay him thirty-three per cent. of the ore. 2nd. Among the proper and legal papers required to be signed by the parties, was not only the above obligation, but also some instrument binding them to work the mines and take the ore in a reasonable time, no such obligation being found in the memorandum itself, which binds Gray alone. 3rd. Conceding the above not to be requisite, still the nature of the contract required that the appellants should take the ore from the mines in a *reasonable time*, and they admit that they had done nothing from the date of the contract, 16th of April 1850, to the filing of the bill, 15th of November 1851. And we insist, that the appellants, not having alleged that they performed, or offered to perform, or were ready and willing to perform, their part of the contract, and having alleged no reason why they should be excused, or any justification for the default of which they appear from the bill to be guilty, are not entitled to the relief they ask. *Story's Eq. Pl.,* secs. 255, 257. 2 *Story's Eq.,* 771. 11 *G. & J.,* 445, *Oliver vs. Palmer & Hamilton.* 5 *Mason,* 253, *McNeil vs. Magee.* 2 *Sumner,* 296, *Kendall vs. Almy.* 5 *Ves.,* 720, (note,) *Milward vs. Earl of Thanet.* 13 *Do.,* 225, *Alley vs. Deschamps.* 4 *Dallas,* 347, *Hollingsworth vs. Fry.* 1 *Johns. Ch. Rep.,* 370, *Benedict vs. Lynch.* 5 *Viner's Abr.,* 538. 4 *Ves.;* 687, *Harrington vs. Wheeler.* 4 *Johns. Ch. Rep.,* 559, *Hatch vs. Cobb.*

2nd. Because this memorandum is not certain, fair and equal in all its parts, is not of mutual obligation, Gray alone being bound by it, and, for want of some obligation on the appellants, does not accomplish the objects Gray had in view in entering into it; and lastly, because it would now be impossible to award to Gray full and beneficial satisfaction in damages for the *laches,* whereof the appellants appear by their bill to have been guilty. 2 *Story's Eq.,* secs. 750, 769, 776. 7 *Gill,* 131, *Tyson vs. Watts.* 4 *Gill,* 472, *Geiger vs. Green.*

1 *Sch. & Lef.,* 21, *Lawrenson vs. Butler.* 3 *Eng. Law & Eq. Rep.,* 425, *Governor, &c., vs. Fox.* 1 *Johns. Ch. Rep.,* 372, *Benedict vs. Lynch.* 2 *Sch. & Lef.,* 553, *Harnett vs. Yielding.* 2 *Md. Ch. Dec.,* 404, *Duvall vs. Myers.* If the appellees had attempted to proceed against the complainants, what could they have recovered? They make no covenant, no stipulation, and do not even *sign* the contract. It is not a *grant,* but a mere *revocable* license. 13 *Mees. & Wels.,* 847, *Wood vs. Leadbitter.* 10 *Lib. Law & Eq.,* 102. 53 *Law Lib.,* 3. 1 *Chitty's Pr.,* 305. 5 *Barn. & Cres.,* 221, *Hewlins vs. Shippam.* 1 *G. & J.,* 382, *Hays vs. Richardson.* As a *grant,* it is void at common law, and courts of equity never will enforce a contract thus void unless there is part performance. There is no part performance here. The simple payment of money is never so regarded; for there is in such cases a full *redress at law.*

3rd. Because the appellees, other than Gray, appear from the bill to be *bona fide* purchasers, without notice, for value, (the bill not charging notice,) and even admitting they have paid but part of the consideration, nevertheless the contract cannot be specifically enforced against them without injury to their rights, nor is it any longer possible to enforce it against Gray, he having fairly parted with the control of the property, while the appellants were in default. *Story's Eq. Pl., sec.* 263. 2 *Story's Eq.,* secs. 769, 776. 2 *Sch. & Lef.,* 553, *Harnett vs. Yielding.* 1 *G. & J.,* 227, *Tiernan vs. Poor.* 4 *Johns. Ch. Rep.,* 559, *Hatch vs. Cobb.*

4th. Because the appellants, if entitled to any relief against the appellees, could have full, complete and adequate remedy by a suit at law, nor are they entitled to relief in equity as incident to the discovery they seek, nor, in fine, do they show by their bill any right to such discovery. 2 *Story's Eq., secs.* 718, 746, 1503. 1 *Do., secs.* 72, 74. 11 *G. & J.,* 444, *Oliver vs. Palmer & Hamilton.*

5th. Because if a decree for specific performance be denied, the bill should not be retained for compensation, but the complainants should be remitted to their remedy at law. 2 *Story's Eq., secs.* 796, 797, 798. 4 *Johns. Ch. Rep.,* 559, *Hatch vs.*

*Cobb.* 1 *Sch. & Lef.*, 25, *Lawrenson vs. Butler.* Again, the decree passed in this case was conditional. It dismissed the bill as against all the defendants except Gray, and retained it as to him, only upon condition that the original agreement was filed to be cancelled. This the complainants refused to do. They filed the agreement, but with a *protest* as to the effect of such filing. This was not an unconditional compliance with the *condition* upon which the bill was to be retained.

Tuck, J., delivered the opinion of this court.

We have considered this case with every disposition to grant to the complainants the benefit of the agreement which they seek to have performed. Having, in good faith, paid $10,000 in part execution on their side, it is reasonable and just that the other party should comply on his part, if such relief can be enforced consistently with established rules of equity. But we have not been able to discover such stipulations in the agreement as exempt it from the operation of the principles laid down in the cases of *Geiger vs. Green*, 4 *Gill*, 472, and *Tyson vs. Watts*, 7 *Gill*, 124. The chief difference between them is, that here there was a substantial price advanced by the complainants, whereas no such consideration was paid by the parties claiming execution of the contracts in the two cases referred to. That circumstance, however, cannot vary the construction of the instrument, or supply essentials in which it may be deficient, although it is entitled to weight in the final disposition of the case.

The learned judge below has very clearly shown the similarity between these cases, and indicated the particulars wherein the contract, now under consideration, is defective in qualities entitling the complainants to a specific performance. And, concurring with him, that it is not such an one as the parties can call upon a court of equity to execute, we are relieved from the necessity of inquiring whether the bill was filed within a reasonable time, and contains a sufficient offer, by the appellants, to execute the contract on their part.

The appellees insist, that the decree is erroneous in so far

as it makes provision for compensation to the complainants as to the amount paid by them to Gray; and that, if correct in this respect, the appellants did not comply with the condition of the decree by an unqualified submission to its terms. As to the first objection it may be observed, that the defendants have not appealed, and cannot complain here of this provision in the decree, yet the complainants may, if, being entitled to compensation, the decree does not go far enough in that behalf; and, as to the second, that the terms imposed on the complainants did not take away their right of appeal. The bill was dismissed as to the material relief sought, and under their appeal the complainants may claim a reversal or modification of the decree to suit the equity of the case, and if they had filed the original agreement, without any protest whatever, the appeal might have been prosecuted. This part of the decree, we suppose, was not designed to cut off the appeal, but merely to secure the defendant, Gray, against another litigation on the same cause of action, after the complainants had accepted compensation in this case.

We must remember that the record is before us on demurrer which admits the case made by the bill, averring that, though true, it constitutes no ground for relief. *Carroll vs. Waring,* 3 *G. & J.,* 497. 3 *Bland,* 135. If it be true, as we must assume, that these parties were prevented from availing of the profits of their agreement by the fraudulent contrivances of the defendant Gray, in transferring large portions or shares of this property to others, in the manner stated in the bill, it would be a great failure of justice to discharge him altogether from performing the contract, without any compensation to them for the large amount advanced; especially as he has not defended the case on the merits, and offered to show that the complainants have suffered, if at all, by their own unreasonable delay, which, we may remark, is the only default imputed to them. The decree allowed him the benefit of the demurrer, as well as of an answer, to be filed, litigating the question of compensation. We think, in such a case, a party should be held to the confession made by his pleading, and that, having received the price agreed to be advanced on the contract, he should

comply or refund the money. If, waiving special defences, the defendants had contested the bill on the merits, the case might have been governed by principles applicable to a state of facts, not appearing on this record, showing that the complainants were not entitled to any relief. -

We are aware that the power to grant compensation is not exercised in all cases of bills for specific performance; but, that such jurisdiction exists, we have no doubt, though it should be exercised "under special circumstances, and upon peculiar equities; as, for instance, in cases of fraud; or where the party has disabled himself by matters *ex post facto*, from a specific performance; or where there is no adequate remedy at law." (2 *Story's Eq.*, 796, 797, 798, 799,) and it has been granted in cases for the transfer of stock. (*Forrest vs. Elwes*, 4 *Ves.*, 493. *Cud vs. Rutter*, 1 *Peere. Wms.*, 572, 'notes,') in which class of contracts specific performance is not generally decreed. The mode of ascertaining the compensation is not uniform. In some cases it has been by an issue *quantum damnificatus;* in others, by reference to the Master. But where, as here, the case is confessed, and no defence set up, we perceive no necessity for an inquiry on the point. The measure ought to be the amount paid with interest. This principle was acted upon in 1 *Peere Wms.*, 572, *note*, and 4 *Ves.*, 497. In the latter case it was said, by the Master of the Rolls, to be a moderate compensation for a breach of contract, by a party with his eyes open, to give back the money with interest; that a jury could not adopt a better rule. And in the case of *Pratt vs. Law*, 9 *Cranch*, 494, the court said: "An issue *quantum damnificatus* is certainly competent to the court to order in this case; but it is not consistent with the equity practice to order it in any case in which the court can lay hold of a simple, equitable, and precise rule, to ascertain the amount which it ought to decree." Accordingly, the party was required to refund, with interest, at the rate of the original purchase, for the quantity of land as to which performance could not be decreed. It is shown by the bill, that the defendants, other than Gray, have paid but a small, if any, portion, of the consideration agreed to be paid by them to Gray, and that he has still a large

interest in the property, or in reserved stock of the company. Without deciding how far the interests of the other parties can, under the case made by the pleadings, be made answerable for the advance by the complainants to Gray, we are of opinion that his entire interest should be held as security for the repayment, with interest from the date of the agreement, and shall remand the cause under the act of 1832, ch. 302, sec. 6, that a decree may be passed accordingly: as to the specific performance the prayer of the bill will be denied.

*Cause remanded.*